# IN THE SUPREME COURT OF CALIFORNIA

MONSTER ENERGY COMPANY,
Plaintiff and Respondent,

v.

BRUCE L. SCHECHTER et al.,
Defendants and Appellants.

S251392

Fourth Appellate District, Division Two
E066267

Riverside County Superior Court
RIC1511553

---

July 11, 2019

Justice Corrigan authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Chin, Liu, Cuéllar, Kruger, and Groban concurred.

---

MONSTER ENERGY CO. v. SCHECHTER

S251392


Opinion of the Court by Corrigan, J.


Here the parties to a tort action agreed to settle their lawsuit. Their agreement was reduced to writing and included several provisions purporting to impose confidentiality obligations on the parties and their counsel. All parties signed the agreement and their lawyers signed under a notation that they approved the written agreement as to form and content.

Counsel allegedly violated the agreement by making public statements about the settlement and were sued, inter alia, for breach of contract. Counsel urged they were not personally bound by the confidentiality provisions and moved to dismiss the suit under the anti-SLAPP[1] statutes. As to the cause of action at issue here, the trial court denied counsels' motion. The Court of Appeal reversed that ruling, concluding the notation meant only that counsel recommended their clients sign the document. We conclude the notation does not *preclude* a factual finding that counsel both recommended their clients sign the document *and* intended to be bound by its provisions.

---

[1] " 'SLAPP' is an acronym for 'strategic lawsuit against public participation.' " (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 381, fn. 1 (*Baral*), citing *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57.)

## I. BACKGROUND

In 2012, Wendy Crossland and Richard Fournier sued Monster Energy Company ("Monster Energy") for products liability and wrongful death following the death of their daughter. (Hereafter "the Crossland suit.") Bruce L. Schechter and his firm R. Rex Parris Law Firm represented Crossland and Fournier.[2] In 2015, the parties entered into a confidential settlement agreement. The agreement stated that it was made "on the behalf of the settling Parties, individually, as well as on the behalf of their, without limitation, respective beneficiaries, trustees, principals, *attorneys*, officers, directors, shareholders, employers, employees, parent company(ies), affiliated company(ies), subcontractors, members, partners, subsidiaries, insurers, predecessors, successors-in-interest, and assigns."[3] (Emphasis added.) The agreement included a confidentiality clause: "The Parties understand and acknowledge that all of the terms, conditions and details of this Settlement Agreement including its existence are to remain confidential. Plaintiffs *and their counsel* agree that they will keep completely confidential all of the terms and contents of

---

[2]  Crossland and Fournier were also represented by attorney Michael E. Blumenfield of Miles & Stockbridge P.C.

[3]  A section entitled "Binding Agreement" stated: "The Parties acknowledge that this Settlement Agreement, inclusive of the releases contained herein, was the product of good faith negotiations, is final, and wholly binding upon them, as well as inure to the benefit of the Released Parties, inclusive of, but not limited to, their respective successors, devisees, executors, administrators, affiliates, representatives, insurers, spouse, dependents, successors, heirs, issue, assigns, officers, directors, partners, agents, subcontractors, *attorneys*, employers, and employees."

this Settlement Agreement, and the negotiations leading thereto, and will not publicize or disclose the amounts, conditions, terms, or contents of this Settlement Agreement in any manner . . . . [¶] Specifically, and without limitation, Plaintiffs *and their counsel of record*, individually and on behalf of themselves and their principals, partners, agents, attorneys, servants, representatives, parents, spouse, dependents, issue, heirs, insurers, predecessors, successors-in-interest and assigns agree and covenant, absolutely and without limitation, to not publicly disclose to any person or entity, including, but not limited to, newspapers, magazines, television, fliers, documentaries, brochures, Lawyers & Settlements, VerdictSearch (or the like), billboards, radio, newsletters, and/or the Internet" certain facts related to the settlement. (Emphasis added.) The agreement continued that "[i]n regard to any communication concerning the settlement of this Action, the Parties *and their attorneys* and each of them hereby agree that neither shall make any statement about the Action, each other party or Defendants' products in relation to this Action, in the media, including but not limited to print, television, radio or Internet," and any comment "shall be limited to the following, or words to their effect: 'This matter has been resolved.'" (Emphasis added.) The agreement also contained other provisions referring to attorneys for the parties in the Crossland suit.[4] The agreement was signed by the

---

[4] The provisions included: (1) a release and discharge of the parties and their attorneys from claims arising from the suit, except that "[n]othing herein, however, shall be deemed a limitation of any kind, release, and or discharge on, or prohibition of Plaintiffs' attorneys' prosecution of any current or future claims against the Released Parties not arising out of

parties. The parties' attorneys, including Schechter, signed under the preprinted notation "APPROVED AS TO FORM AND CONTENT."

Shortly after the settlement, an article appeared on the website "LawyersandSettlements.com" entitled " 'Substantial Dollars' for Family in Monster Energy Drink Wrongful Death Suit." The article, written by Brenda Craig, attributed several quotes to Schechter. According to the article, "Schechter's most recent case resulted in 'substantial dollars' for the family of a 14-year-old that went to the mall with girlfriends in the summer of 2011, drank two Monster Energy drinks and died of cardiac arrest. [¶] Schechter can't reveal the exact amount because he says, 'Monster wants the amount to be sealed.' " The article describes how Schechter has filed three additional suits against Monster Energy and quotes his statements that he believes its products are unsafe. The article concluded with a link and a phone number for "Monster Energy Drink Injury Legal Help." Craig attested to the accuracy of Schechter's statements quoted in the article.

Monster Energy sued defendants Schechter and R. Rex Parris Law Firm, alleging four causes of action: breach of contract; breach of the implied covenant of good faith; unjust

---

the Incident in any jurisdiction and venue"; and (2) a non-disparagement clause applicable to the parties but which did not limit "Plaintiffs' attorneys' ability to disparage (within the confines of the law) Defendants or Defendants' products in connection with other current or future litigation against the Released Parties in any jurisdiction and venue" or "Plaintiffs' attorneys' prosecution of other current or future litigation against the Released Parties in any jurisdiction and venue."

enrichment; and promissory estoppel. Defendants filed a special motion to strike the complaint (Code Civ. Proc., § 425.16), arguing the suit implicated Schechter's constitutional free speech rights. The court denied the motion as to the breach of contract claim but granted it as to the other causes of action. The court found "the settlement clearly contemplates counsel as being subject to the agreement" and noted that "Schechter signed the agreement." The court concluded that the "suggestion that [Schechter] is not a party to the contract merely because he approved it as to form and content only is beyond reason." The Court of Appeal reversed the trial court's denial of the anti-SLAPP motion as to the breach of contract claim. (See *Monster Energy Co. v. Schechter* (2018) 26 Cal.App.5th 54.)

## II. DISCUSSION

### A. *Legal Background*

"Code of Civil Procedure section 425.16 sets out a procedure for striking complaints in harassing lawsuits that are commonly known as SLAPP suits . . . which are brought to challenge the exercise of constitutionally protected free speech rights." (*Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 196.) A cause of action arising from a person's act in furtherance of the "right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability" that the claim will prevail. (Code Civ. Proc., § 425.16, subd. (b)(1).) "The anti-SLAPP statute does not insulate defendants from *any* liability for claims arising from the protected rights of

petition or speech. It only provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity. Resolution of an anti-SLAPP motion involves two steps. First, the defendant must establish that the challenged claim arises from activity protected by section 425.16. [Citation.] If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success. We have described this second step as a 'summary-judgment-like procedure.' [Citation.] The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law. [Citation.] '[C]laims with the requisite minimal merit may proceed.' " (*Baral, supra,* 1 Cal.5th at pp. 384-385, fn. omitted.) The grant or denial of an anti-SLAPP motion is reviewed de novo. (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067.) As to the second step, a plaintiff seeking to demonstrate the merit of the claim "may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence." (*San Diegans for Open Government v. San Diego State University Research Foundation* (2017) 13 Cal.App.5th 76, 95; see *Grenier v. Taylor* (2015) 234 Cal.App.4th 471, 480; *City of Costa Mesa v. D'Alessio Investments, LLC* (2013) 214 Cal.App.4th 358, 376; *Paiva v. Nichols* (2008) 168 Cal.App.4th 1007, 1017.)

It is undisputed that defendants met their first-step showing. The issue here is whether Monster Energy

sufficiently established a probability of prevailing on its breach of contract claim. That claim, in turn, hinges on whether defendants were bound by the confidentiality provisions of the Crossland settlement. "A settlement agreement is a contract, and the legal principles which apply to contracts generally apply to settlement contracts. [Citation.] An essential element of any contract is 'consent.' [Citations.] The 'consent' must be 'mutual.' [Citations.] 'Consent is not mutual, unless the parties all agree upon the same thing in the same sense.' (Civ. Code, § 1580; see also Civ. Code, § 1636 . . . .)" (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 810-811; see Civ. Code, § 1550 [essential elements of a contract].) " 'The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe. [Citation.] Accordingly, the primary focus in determining the existence of mutual consent is upon the acts of the parties involved.' " (*T.M. Cobb Co. v. Superior Court* (1984) 36 Cal.3d 273, 282; see Civ. Code, § 1565 [essentials of consent].)

There is no question that the language of the settlement agreement generally, and the confidentiality provisions in particular, purported to encompass not only the Crossland parties but also their respective counsel. Further, counsel could consent to be bound by the agreement's provisions, and, ordinarily, "[i]n the absence of fraud, mistake, or another vitiating factor, a signature on a written contract is an objective manifestation of assent to the terms set forth there." (*Rodriguez v. Oto* (2013) 212 Cal.App.4th 1020, 1027.) Defendants argue that Schechter's signature on the settlement agreement did not manifest his consent to be bound by its

provisions because he signed under the notation "APPROVED AS TO FORM AND CONTENT." They urge his signature conveyed only that defendants were approving the agreement for their clients' signatures. The Court of Appeal agreed, relying on two cases construing similar notations: *Freedman v. Brutzkus* (2010) 182 Cal.App.4th 1065 (*Freedman*) and *RSUI Indem. Co. v. Bacon* (Neb. 2011) 810 N.W.2d 666 (*RSUI*).

In *Freedman*, two companies, Teddi and CAI, entered into a licensing agreement. During negotiations, attorney Freedman represented Teddi while attorney Brutzkus represented CAI. Because Freedman had performed legal services for CAI in the past, CAI agreed to waive any conflict of interest. The licensing agreement explicitly stated that Freedman represented only Teddi's interests. In addition to the parties, the attorneys signed the licensing agreement with the notation, " 'Approved as to Form and Content.' " (*Freedman, supra,* 182 Cal.App.4th at p. 1068.) A dispute arose and CAI sued Teddi, leading to the latter's bankruptcy. CAI also sued Freedman, alleging Freedman had represented CAI during negotiations and that he made statements assuring CAI that Teddi would fulfill its obligations. In the course of this suit, Brutzkus testified at a deposition that CAI and its owner "were relying on Freedman in connection with the transaction on the basis of their ' "long standing professional relationship," ' " and Brutzkus "did not tell Freedman or anyone else representing Teddi about that reliance on Freedman, or that the conflict waiver provisions in the agreement were inaccurate." (*Ibid*.)

Freedman then sued Brutzkus, alleging tort claims. Freedman asserted that "in approving the agreement, 'as to form and content,' Brutzkus made an actionable representation

. . . as to the accuracy of the agreement" that he knew was false because the agreement included an inaccurate conflict of interest waiver. (*Freedman, supra,* 182 Cal.App.4th at p. 1068.) The trial court granted Brutzkus's demurrer and the Court of Appeal affirmed, reasoning that "the only reasonable meaning to be given to a recital that counsel approves the agreement as to form and content, is that the attorney, in so stating, asserts that he or she is the attorney for his or her particular party, and that the document 'is in the proper form and embodies the deal that was made between the parties." (*Id.* at p. 1070.) *Freedman* approved the trial court's characterization of the phrase as showing "that counsel has read the agreement, that the recital formalizes counsel's involvement as attorney to one of the parties, . . . the recital adds solemnity to the contract's formation," and "Brutzkus gave this approval to his client." (*Ibid.*) *Freedman* concluded "that Brutzkus's signature approving the document as to form and content was not an actionable representation" to opposing counsel. (*Ibid.*)

The Nebraska Supreme Court in *RSUI* applied similar reasoning with respect to a breach of contract claim. Ronald Bacon was injured while working on a construction site. He sued Kiewit Construction, the general contractor, and Ridgetop Holdings, the parent company of the subcontractor that employed him. Kiewit and Bacon settled. The settlement agreement included a provision that, in the event Bacon settles with Ridgetop, "BACON and his attorneys" agree to pay Kiewit a specified percentage of the settlement. (*RSUI, supra,* 810 N.W.2d at p. 670.) The attorneys for both parties signed the agreement under the notation, " 'Agreed to in Form & Substance.' " (*Ibid.*) Bacon subsequently settled with Ridgetop

but refused to pay anything to Kiewit. Kiewit's insurers sued Bacon and his attorneys for breach of contract and obtained a judgment. (*Id.* at p. 671.)

*RSUI* reversed the judgment as to Bacon's attorneys, concluding they had no personal liability. Although acknowledging "the general rule that an agent, acting for a disclosed principal, is not liable for the principal's contract," the court observed that "an agent can become personally liable if 'the agent purports to bind himself or herself, or has otherwise bound himself or herself, to performance of the contract.' " (*RSUI, supra,* 810 N.W.2d at p. 671.) The court held the attorneys did not so bind themselves. The signature "under the legend 'Agreed to in Form & Substance' demonstrates only that he was Bacon's attorney[5] and that 'the document [was] in the proper form and embodie[d] the deal that was made between the parties.' Nothing about the signature indicates or implies an intent to incur personal liability on the contract. Indeed, Kiewit's attorney signed an identical signature block even though no contractual language could be construed to impose a personal obligation on Kiewit's attorney. In addition, the contractual language relied upon by [the insurers] is ambiguous, but at most governs the manner by which payment under the contract was to be made, not the parties which were to be liable for such payment." (*Id.* at p. 672, fn. omitted.)

The Court of Appeal here initially noted "that the confidentiality provisions of the settlement agreement did at least purport to bind the Attorneys." (*Monster Energy Co. v.*

---

[5] Only one of Bacon's attorneys signed the agreement.

*Schechter, supra,* 26 Cal.App.5th at p. 65.) However, the court concluded defendant counsel were not bound by the agreement. It first reasoned that counsel were not identified as parties to the agreement and the parties could not bind them without their consent. (*Id.* at pp. 66-67.) Second, relying on *Freedman* and *RSUI*, the court reasoned that Schechter's signature on the agreement did not express an intent to be bound: "[T]he language in the settlement agreement purporting to impose obligations on the Attorneys was a nullity, unless and until the Attorneys consented to it. And while *Freedman* is not precisely on point, it does stand for the proposition that an attorney's signature under words such as 'approved as to form and content' means only that the document has the attorney's professional thumbs-up. It follows that it does not objectively manifest the attorney's intent to be bound." (*Id.* at p. 69.) While acknowledging that "confidentiality is often a material term of a settlement agreement" and a party may not be inclined to settle if opposing counsel "is free to blab about it," the court suggested "[i]t seems easy enough, however, to draft a settlement agreement that explicitly makes the attorneys parties (even if only to the confidentiality provision) and explicitly requires them to sign as such." (*Ibid.*)

B. *The Significance Of "Approved As To Form And Content"*

In light of the procedural posture here, the issue we address is a narrow one. As noted, at the second anti-SLAPP step, " 'a plaintiff responding to an anti-SLAPP motion must " 'state[] and substantiate[] a legally sufficient claim.' " [Citation.] Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable

judgment if the evidence submitted by the plaintiff is credited." ' [Citation.] '. . . However, we neither "weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." ' " (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820 (*Oasis West*).)

We agree with *Freedman*'s characterization of what the notation "approved as to form and content" means. The notation affirms that counsel has read the document, it embodies the parties' agreement, and counsel perceives no impediment to his client signing it. (*Freedman, supra,* 182 Cal.App.4th at p. 1070; cf. *In re Marriage of Hasso* (1991) 229 Cal.App.3d 1174, 1181.) A similar understanding of this phrase is reflected in case law regarding orders signed by the court and approved as to form and content by the parties' attorneys. (See, e.g., *Wagner v. Wagner* (2008) 162 Cal.App.4th 249, 254; *In re Marriage of Walters* (1990) 220 Cal.App.3d 1062, 1069; *In re Blaze* (1969) 271 Cal.App.2d 210, 213-217.) Thus, there appears a general consensus that "approved as to form and content" has a fixed meaning understood by the legal community, and we do not suggest otherwise.

This does not end our inquiry, however. The legal question is whether counsel's signature approving an agreement as to form and content for his clients' signature *precludes*, as a matter of law, a finding that he also intended to be bound by the agreement. If, as in *Freedman*, the agreement contains no provision purporting to bind counsel or otherwise impose any obligation on him, the question is easily answered. (See *Freedman, supra,* 182 Cal.App.4th at pp. 1068-1069.) In

that circumstance, counsel's signature that he approved the agreement as to form and content could *only* mean he is approving it for his client's signature.

But that will not always be the case. An attorney's signature on an agreement containing substantive provisions imposing duties on counsel may reflect an intent to be bound even though counsel also approves the document for his client's signature. *RSUI* is, of course, not binding on this court, but its reasoning is instructive in this regard. (See *Episcopal Church Cases* (2009) 45 Cal.4th 467, 490.) Concluding that counsel there did not assume personal liability, the *RSUI* court did not rely solely on the signature notation. Instead, it examined the substance of the provisions at issue and reasoned that, at most, the agreement "governs the manner by which payment under the contract was to be made, not the parties which were to be liable for such payment." (*RSUI, supra,* 810 N.W.2d at p. 672.) Thus, counsel's signature that he approved the agreement as to form and content did not reflect his intent to be personally obligated to indemnify an opposing party if his client refused to perform as the agreement required.

Here, a factfinder considering all the circumstances could reasonably conclude Schechter agreed to be bound. (See discussion *post*.) The confidentiality provisions are not only extensive but repeatedly refer both to the parties and their counsel. The agreement stated "Plaintiffs *and their counsel* agree that they will keep completely confidential all of the terms and contents of this Settlement Agreement, and the negotiations leading thereto, and will not publicize or disclose the amounts, conditions, terms, or contents of this Settlement Agreement in any manner," and "without limitation, Plaintiffs *and their counsel of record . . .* agree and covenant, absolutely

and without limitation, to not publicly disclose to any person or entity" facts related to the settlement, specifically identifying "Lawyers & Settlements" as an entity to whom counsel should not disclose such facts. (Emphasis added.) The agreement also required "the Parties *and their attorneys*" not to "make any statement about the Action, each other party or Defendants' products in relation to this Action, in the media," and any comment "shall be limited to the following, or words to their effect: 'This matter has been resolved.' " (Emphasis added.)

These extensive provisions regarding the specific conduct of counsel stand in stark contrast to *RSUI*, where the agreement only referenced counsel with respect to the mechanics of payment under the parties' agreement. Further, *RSUI* involved a different procedural posture. The *RSUI* court reversed the grant of summary judgment against the attorneys after the trial court concluded the attorneys were liable under the contract as a matter of law. By contrast, the trial court here denied defendants' anti-SLAPP motion, rejecting their claim that they were *not* liable as a matter of law. It bears emphasis that a plaintiff's burden at the second anti-SLAPP step is a low one, requiring only a showing that a cause of action has at least "minimal merit within the meaning of the anti-SLAPP statute." (*Oasis West, supra,* 51 Cal.4th at p. 825.)

Our conclusion also recognizes the role that confidentiality plays in facilitating settlement agreements. "The privacy of a settlement is generally understood and accepted in our legal system, which favors settlement and therefore supports attendant needs for confidentiality." (*Hinshaw, Winkler, Draa, Marsh & Still v. Superior Court* (1996) 51 Cal.App.4th 233, 241.) Routine public disclosure of private settlement terms would "chill the parties' ability in

many cases to settle the action before trial.  Such a result runs contrary to the strong public policy of this state favoring settlement of actions." (*Board of Trustees of California State University v. Superior Court* (2005) 132 Cal.App.4th 889, 899.) There is little doubt here that "[c]onfidentiality was an important term of that settlement" (*Jalali v. Root* (2003) 109 Cal.App.4th 1768, 1784), and the agreement goes to great lengths to ensure that virtually nothing would be publicly said about the case other than that it had been resolved.  Indeed, Schechter acknowledged in a deposition that "Monster would not settle the case if the party did not agree to keeping it confidential."  As noted, the agreement stated it was "the product of good faith negotiations."  (*Ante*, at p. 2, fn. 3.) Excluding counsel from the scope of the confidentiality clause would risk undermining an important term of the agreement.[6]

Defendants argue they could not be found to be bound by the settlement because they were not identified as parties to the agreement.  It is true the agreement does not include counsel in its definition of "Party."  However, that label does not answer the question of whether Schechter, by signing an agreement that included provisions purporting to bind him individually, manifested his intent to be so bound.  It is the substance of the agreement that determines his status as a party *to the contract*, as opposed to a party to the lawsuit.  The agreement clearly refers to others beside the Crossland parties.

---

[6]  During the pendency of the anti-SLAPP proceedings, none of the parties have argued that enforcement of the confidentiality provisions here is contrary to public policy (see, e.g., *Cariveau v. Halferty* (2000) 83 Cal.App.4th 126, 130-137), and we do not address the question.

(Cf. *Sharp Image Gaming, Inc. v. Shingle Springs Band of Miwok Indians* (2017) 15 Cal.App.5th 391, 439 [contractual labels not controlling]; *Vons Companies, Inc. v. United States Fire Ins. Co.* (2000) 78 Cal.App.4th 52, 62 [same].)[7]

---

**7**      Defendants assert, without citation to the record, "[t]here is no evidence that Attorney Schechter even negotiated the Settlement Agreement," suggesting that the agreement was negotiated by a different firm.  Even if we were to accept that assertion, it does not assist Schechter.  Regardless of whether he personally negotiated the settlement, an attorney representing the Crossland plaintiffs negotiated the settlement on their behalf.  Schechter thereafter read and signed the document.  Our reasoning regarding the significance of his signature, pertaining to the language of the agreement itself, remains unchanged.

Defendants also argue that plaintiff "presented no evidence of any objective outward manifestation of the Attorneys' consent to be bound by the confidentiality provisions of the Settlement Agreement communicated to Monster Energy."  This argument is premised on defendants' position that Schechter's signature could not convey an intent to be bound by the document he signed, which included provisions specifically applicable to counsel.  As the premise does not hold, the argument necessarily fails.  Similarly lacking merit is defendants' contention that the agreement violates the statute of frauds because it was not "subscribed by" Schechter as a party. (Civ. Code, § 1624, subd. (a).)  As discussed, one may reasonably conclude that Schechter's signature evinced his intent to be bound, thus rendering the agreement "subscribed by" him. (Cf. *In re Marriage of Benson* (2005) 36 Cal.4th 1096, 1108.)

The observations we make here relate only to an analysis of the SLAPP question and a plaintiff's low burden at the second step.  We do not express any opinion as to the facts that may ultimately be adduced at trial.  Nor by our rejection of defendant's legal argument in this regard do we intend to

We conclude that an attorney's signature on a document with a notation that it is approved as to form and content does not, as a matter of law, preclude a factual finding that the attorney intended to be bound by the document's terms. The intent question requires an examination of the agreement as a whole, including substantive provisions referring to counsel. Ultimately, that question would be resolved by the trier of fact.[8]

C. *Consideration Of Evidence At The Second Anti-SLAPP Step*

Monster Energy argues the Court of Appeal "ignored" evidence supportive of its position, including Schechter's statement to reporter Craig that he could not reveal the amount of the settlement because "Monster wants the amount to be sealed," and his deposition testimony explaining his signature. Monster contends this evidence showed Schechter was aware that he was bound by the confidentiality provisions. Defendants counter that the evidence was irrelevant to establish an intent to be bound, arguing Schechter was merely manifesting his ethical obligation to maintain client confidences.

---

foreclose any defenses or inferences defendant may argue at trial.

[8] We do not suggest that counsel's signature on a settlement agreement approving it as to form and content will *always* create a triable issue of fact with respect to counsel's intent to be bound by that agreement. A court may find as a matter of law that counsel could not have so intended under the circumstances where, for example, no substantive provisions imposed obligations on counsel, as was the case in *Freedman*.

As discussed, at the second anti-SLAPP step, a court "does not *weigh* the credibility or comparative probative strength of competing evidence." (*Taus v. Loftus* (2007) 40 Cal.4th 683, 714.) It "accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law." (*Baral, supra,* 1 Cal.5th at p. 385.) "[W]e resolve conflicts and inferences in the record in favor of plaintiff." (*Armin v. Riverside Community Hospital* (2016) 5 Cal.App.5th 810, 815.) However, speculative inferences not supported by the evidence proffered need not be considered. (See *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 931.)

Monster Energy is correct that properly submitted admissible evidence should be considered, and a court evaluating a probability of success should draw any non-speculative inferences favorable to the plaintiff. (*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 949; see Code Civ. Proc., § 425.16, subd. (b)(2).) Here, the Court of Appeal had no occasion to consider the cited evidence in light of its erroneous legal conclusion that a signature with a notation that counsel approved the agreement as to form and content precluded an inference that counsel also intended to be bound by its terms. We review de novo the probability of success and consider the evidence below. (*Sweetwater*, at p. 940.)

D. *Plaintiff Has Sufficiently Shown A Probability Of Prevailing*

On this record, plaintiff has shown a probability of success sufficient to defeat defendant's claim the suit lacks even minimal merit. "The Legislature's inclusion of a merits prong to the statutory SLAPP definition . . . preserves

appropriate remedies for breaches of contracts involving speech by ensuring that claims with the requisite minimal merit may proceed. [Citations.] Indeed, as the statute is designed and as we have construed it, a defendant who in fact has validly contracted not to speak or petition has in effect 'waived' the right to the anti-SLAPP statute's protection in the event he or she later breaches that contract." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 94.)

Here, the settlement agreement makes numerous references to counsel as one whose keeping of confidentiality is assured. The wording can be understood to reflect an expectation that the confidentiality provisions would apply to counsel as well.[9] Given this backdrop, it is reasonable to argue that counsel's signature on the document evinced an understanding of the agreement's terms and a willingness to be bound by the terms that explicitly referred to him, which, in turn, would appear consistent with the expectations of the parties and their counsel. This understanding is also supported by Schechter's statement to reporter Craig that he could not divulge the settlement amount because " 'Monster wants the amount to be sealed,' " which, when viewed in the light most favorable to plaintiff, could be interpreted as a tacit acknowledgement that he was bound by the confidentiality provisions. Further, assuming the confidentiality provisions applied to him, sufficient evidence was presented that Schechter violated them by making public comments about the

---

[9] We have no occasion to decide if any terms of the settlement agreement apply to entities other than the parties and their respective counsel.

settlement to a reporter from LawyersandSettlements.com.  In light of the nature and extent of provisions in the agreement here purporting to bind counsel, and the other properly submitted evidence, Monster Energy has met its burden of showing its breach of contract claim has "minimal merit" sufficient to defeat an anti-SLAPP motion.  (*Oasis West, supra,* 51 Cal.4th at p. 825.)

## III.  DISPOSITION

The judgment of the Court of Appeal is reversed.


**CORRIGAN, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Monster Energy Company v. Schechter

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 26 Cal.App.5th 54
**Rehearing Granted**


_____

**Opinion No.** S251392
**Date Filed:** July 11, 2019

_____

**Court:** Superior
**County:** Riverside
**Judge:** Daniel A. Ottolia


_____

**Counsel:**

Bremer Whyte Brown & O'Meara, Keith G. Bremer, Jeremy S. Johnson, Benjamin L. Price; Grignon Law Firm, Margaret M. Grignon and Anne M. Grignon for Defendants and Appellants.

Shook, Hardy & Bacon, Frank C. Rothrock, Gabriel S. Spooner and Victoria P. McLaughlin for Plaintiff and Respondent.

Murchison & Cumming, Edmund G. Farrell, III; Walsh Pizzi O'Reilly Falanga, Peter J. Pizzi and Katherine M. Romano for International Association of Defense Counsel as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Margaret M. Grignon
Grignon Law Firm
6621 East Pacific Coast Highway, Suite 200
Long Beach, CA  90803
(562) 285-3171

Frank C. Rothrock
Shook, Hardy & Bacon
5 Park Plaza, Suite 1600
Irvine, CA  92614-2546
(949) 475-1500