Filed 8/27/20  Quality Control Restoration v. Shakian CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| QUALITY CONTROL RESTORATION,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>VATCHE SAHAKIAN,<br><br>Defendant and Appellant. | B293426<br><br>(Los Angeles County Super. Ct. No. EC068466) |

APPEAL from an order of the Superior Court of Los Angeles County, William D. Stewart, Judge.  Affirmed.

Hartsuyker, Stratman & Williams-Abrego, Jeffrey E. Lerman; Veatch Carlson and Serena L. Nervez for Defendant and Appellant.

Cole Pedroza, Kenneth R. Pedroza, Joshua C. Traver, Scott M. Klausner; Fierstadt Law Group, Jack A. Fierstadt and Brandon A. Carroll for Plaintiff and Respondent.

_____

Defendant Vatche Sahakian appeals the trial court's denial of his special motion to strike under section 425.16 of the Code of Civil Procedure (anti-SLAPP). We have jurisdiction under Code of Civil Procedure[1] sections 425.16, subdivision (i), and 904.1. We affirm.

## BACKGROUND

Plaintiff Quality Control Restoration, doing business as Quality Control Services (QCS), is a repair and damage restoration service based in La Verne, California. Sahakian is a unit owner and resident in the 134-unit Cordova Park Villas (CPV) condominium complex in Pasadena, California. Prior to the events alleged in this action, QCS had been hired by the CPV homeowners' association (HOA) to perform a number of repair projects on the property.

Over the years, CPV residents would provide QCS with a key to their units so that work could be performed. In May of 2017, QCS was hired to perform repairs in a number of units that included Sahakian's unit. However, Sahakian was unwilling to provide a key for access, and insisted on being present to provide access at times convenient to him. Scheduling disputes arose and the work QCS was to perform was delayed. QCS contends that this led Sahakian to institute a campaign to disparage and defame QCS.

"In or about June of 2017," QCS's complaint alleges, "[Sahakian] sent a letter to all CPV residents expressing concerns about HOA operations. Specifically, [Sahakian]'s letter stated:

---

[1] Unless otherwise specified, all statutory references herein are to the Code of Civil Procedure.

2

[¶] In recent years, QCS has been almost exclusively contracted for all repairs, yet their service has not always been adequate. For example, sometimes units have incurred damages during and because of these repairs, and these damages have not been addressed. Additionally, these repairs are done at a very slow pace—often at great inconvenience to owners/tenants and sometimes leading to more repairs and cost for the HOA. In some cases, the work has even been substandard and/or did not address, the problem at hand. Some of us have noticed waste in material and supplies. In one instance, an owner independently obtained bids on the exact same repairs; the estimate QCS gave was almost two times costlier that that of two other reputable companies, and QCS asked for thrice the time to complete work."

In April of 2018, QCS filed a civil action for slander per se and libel per se against Sahakian. In July of 2018, Sahakian filed a special motion to strike under section 425.16 (anti-SLAPP), with the hearing set for August 24, 2018. This motion included a declaration from Sahakian attaching the entire letter from which the paragraph quoted above was excerpted in the complaint.

QCS opposed the motion on August 13, 2018, including declarations from Rick Landi (owner of QCS), Phillip DeSautell (a CPV unit owner), and Brad Chisler (another CPV unit owner). These declarations sought to refute the statements made by Sahakian, alleged damage caused to QCS by Sahakian, and set forth additional examples of statements about QCS by Sahakian asserted to be false. Sahakian filed a reply brief in support of the motion, challenging the showing made by QCS.

The trial court heard the motion on August 24, 2018, and denied it. The trial court held that Sahakian had failed to

establish that the QCS complaint was directed to one of the protected activities under section 425.16, subdivision (e).  The court did not reach the question of whether there was a probability that QCS would prevail on its claims under section 425.16, subdivision (b)(1).  This appeal by Sahakian followed.

## DISCUSSION

### A. Applicable Law

The requirements for anti-SLAPP motions under section 425.16 are familiar.  Section 425.16 provides, inter alia, that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."  (*Id*., subd. (b)(1).)  An " 'act in furtherance of a person's right of petition or free speech . . . in connection with a public issue' " is defined in section 425.16 to include, in relevant part: "any . . . conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  (*Id.*, subd. (e)(4).)

The Legislature enacted section 425.16 to prevent and deter "lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances."  (§ 425.16, subd. (a).)  Thus, the purpose of the anti-SLAPP law is "not [to] insulate defendants from *any* liability for claims arising from the protected rights of petition or speech.  It only provides a procedure for weeding out, at an early

4

stage, *meritless* claims arising from protected activity." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).)

When a party moves to strike a cause of action under the anti-SLAPP law, a trial court evaluates the special motion to strike using a two-prong test: (1) has the moving party "made a threshold showing that the challenged cause of action arises from protected activity" (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056) and, if so, (2) has the non-moving party demonstrated that the challenged cause of action has " 'minimal merit' " by making "a prima facie factual showing sufficient to sustain" a judgment in its favor. (*Baral, supra*, 1 Cal.5th at p. 385; *Navellier v. Sletten* (2002) 29 Cal.4th 82, 93-94; see § 425.16, subd. (b)(1).) After the first prong is satisfied by the *moving* party, the burden shifts to the *non-moving* party to "demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated." (*Baral*, at p. 396.) If the plaintiff can show a probability of prevailing on any part of its claim, the cause of action is not meritless and will not be stricken. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.)

## B. Standard of Review

We review a trial court's ruling on a special motion to strike pursuant to section 425.16 under the de novo standard. (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788; *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067.) "In other words, we employ the same two-pronged procedure as the trial court in determining whether the anti-SLAPP motion was properly granted." (*Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1652.)

5

As does the trial court, we "consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) In considering the pleadings and declarations, we do not make credibility determinations or compare the weight of the evidence; instead, we accept the opposing party's evidence as true and evaluate the moving party's evidence only to determine if it has defeated the opposing party's evidence as a matter of law. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)

## C. Prong 1: Arising from Protected Activity

Sahakian's initial burden is to show that the two causes of action in QCS's complaint against Sahakian arise from protected activity on his part. (*Park v. Board of Trustees of California State University*, *supra*, 2 Cal.5th at p. 1061.)

QCS's libel per se and slander per se causes of action are based on written and oral communications by Sahakian to fellow residents and unit owners at the CPV complex concerning alleged deficiencies in the work by QCS and excessive cost and inconvenience to the homeowners for this work. The question before the trial court, and before us on de novo review, is whether Sahakian's communications to CPV owners and residents constitute "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest" within the meaning of section 425.16, subdivision (e)(4).

The full text of Sahakian's letter to CPV owners and residents was submitted in support of Sahakian's anti-SLAPP motion, and is set forth in the Appendix to this opinion. The letter begins: "Dear neighbor, [¶] We write to you on behalf of a

6

small group of owners that have recently grown concerned about our Cordova complex and the operations of our HOA.  We greatly value the service of our HOA Board members who have volunteered to do an often thankless job representing our collective interests.  However, several recent developments suggest that we have inadvertently entered a mode of operation that is not necessarily in the best interest of all the owners and the long term health of our HOA."  The letter then sets out a number of concerns (focusing significant attention on the work of QCS), and concludes with a one-page proposed draft letter to be sent to the HOA setting out these concerns, as well as an announcement of a meeting of homeowners to discuss these issues.

The trial court determined that Sahakian had not demonstrated that his conduct fell with the first prong of section 425.16, noting that "[Sahakian's] letter at issue was circulated amongst fellow residents and had not yet been presented to the CPV's HOA, nor were the residents' complaints about [QCS's] repair performance at issue before the HOA."  The trial court ruled that Sahakian's communication therefore did not arise in a setting where "homeowners were in active disputes with their respective HOAs" nor address "an ongoing dispute that would potentially affect the fellow residents."  Accordingly, the trial court ruled that Sahakian had not established that his letter involved protected activity under section 425.16 (the first anti-SLAPP prong).  The trial court did not reach the second question whether QCS had established sufficient probability that it would prevail on its claims.

In reviewing the trial court's analysis of this issue, we are guided by the California Supreme Court's recent statement that

7

"context matters" in analyzing anti-SLAPP motions premised on free speech claims under section 425.16, subdivision (e)(4). *(FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 149 ["court must consider the context as well as the content of a statement in determining whether that statement furthers the exercise of constitutional speech rights in connection with a matter of public interest"].) We conclude that the trial court's distinction based on whether an active dispute with the HOA had actually commenced leads to an excessively narrow construction of section 425.16, subdivision (e)(4), contrary to the statutory directive in section 425.16, subdivision (a), that "this section shall be construed broadly" in order "to encourage continued participation in matters of public significance."

The context here clearly involves an effort by Sahakian to enlist support from fellow unit owners in taking formal steps to raise with the HOA and "remedy" what he contended were serious shortcomings in the governance provided by the HOA, which impacted all unit owners. Case law recognizes that this sufficiently constitutes an issue of public interest for purposes of section 425.16. "The definition of 'public interest' within the meaning of the anti-SLAPP statute has been broadly construed to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity." (*Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479 (*Damon*).)[2] " 'Although matters of public interest

---

[2] In support of its finding that the "issue of public interest" criterion had been met in that case, the *Damon* court cited *Chantiles v. Lake Forest II Master Homeowners Assn.* (1995) 37 Cal.App.4th 914, where the court observed: "For many

include legislative and governmental activities, they may also include activities that involve private persons and entities, especially when a large, powerful organization may impact the lives of many individuals.' [Citations.]" (*Macias v. Hartwell* (1997) 55 Cal.App.4th 669, 674.)

Here, the applicable public interest is criticism of the manner in which the HOA governed and managed the finances of CPV, including an examination of the community benefits received under the prior special assessment and whether to continue entering into similar construction contracts in the future. Similar to *Damon,* Sahakian's statements concerned (1) the decision of unit owners whether to vote for another special assessment for construction work, and (2) the competency of the HOA to engage in construction work that was in the best interest

---

Californians, the homeowners association functions as a second municipal government, regulating many aspects of their daily lives. The court in *Cohen v. Kite Hill Community Assn.* (1983) 142 Cal.App.3d 642 . . . noted the 'quasi-governmental' nature of homeowners associations. ' "[U]pon analysis of the association's functions, one clearly sees the association as a quasi-government entity paralleling in almost every case the powers, duties, and responsibilities of a municipal government. As a 'mini-government,' the association provides to its members, in almost every case, utility services, road maintenance, street and common area lighting, and refuse removal. In many cases, it also provides security services and various forms of communication within the community. There is, moreover, a clear analogy to the municipal police and public safety functions. All of these functions are financed through assessments or taxes levied upon the members of the community, with powers vested in the board of directors . . . clearly analogous to the governing body of a municipality." ' (*Id.* at p. 651 . . . .)" (*Chantiles, supra,* at p. 922.)

9

of the CPV residents. Sahakian's statements encouraged the community to participate in the decision-making process regarding the impending special assessment to support yet another construction contract. (*See Country Side Villas Homeowners Assn. v. Ivie* (2011) 193 Cal.App.4th 1110, 1118 ["It is clear from the evidence that the action in this case arose from [the defendant's] exercise of her right of free speech in criticizing and speaking out against the action of [the plaintiff's] board"].)

While it is correct that the court in *Colyear v. Rolling Hills Community Assn. of Rancho Palos Verdes* (2017) 9 Cal.App.5th 119 found that the applicability of tree-trimming covenants to lots not expressly burdened by them, and the HOA's authority to enforce such covenants, "was an ongoing topic of debate between the board and homeowners, resulting in multiple hearings, letters, and several changes to the board's policy" (*id.* at p. 133), we find nothing in this decision suggesting that the coverage of section 425.16, subdivision (e)(4), can only apply where an active controversy involving the HOA has actually arisen, as the trial court here ruled. The communication by Sahakian clearly contemplated that such controversy was imminent. The trial court's distinction based on whether the HOA itself was yet actively involved in the nascent dispute is not a valid one, because it does not properly focus on the nature of Sahakian's communications as addressing "a public issue or an issue of public interest." Thus, while we agree with the trial court's observation that "[n]ot every mundane communication between a homeowners association and a homeowner gives rise to a freedom of speech issue" (*Turner v. Vista Pointe Ridge Homeowners Assn.* (2009) 180 Cal.App.4th 676, 679), we conclude that *this* communication was one that falls under the protection of the first

10

prong of section 425.16, because it was addressed to all CPV unit owners and touched on matters of interest to those unit owners. Thus, the trial court erred in denying Sahakian's motion on the basis that he had not satisfied the first prong.

## D. Prong 2: Probability of Prevailing on the Merits

Although we have concluded that the trial court erred in ruling that the first prong under section 425.16 had not been satisfied, that does not end the analysis of whether the anti-SLAPP motion to strike should have been granted. Under the statute, satisfying the first prong simply shifts to the plaintiff the burden of demonstrating merit in its alleged causes of action under the second prong. (*Baral*, *supra*, 1 Cal.5th at p. 396.) The trial court did not examine this question, having ended its analysis once it concluded that prong 1 was not satisfied.

We could remand this matter to permit the trial court to make an initial determination whether prong 2 has been satisfied by QCS, but we do not believe it makes sense to do so here. We have before us the submissions made to the trial court. Our review of the trial court's order denying the anti-SLAPP motion is de novo. (*Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1262.) "Because the motion raises only questions of law regarding the construction and effect of the supporting and opposing papers, this court [can] make its own independent determination of the questions of law raised in the motion." (*Spitler v. Children's Institute International* (1992) 11 Cal.App.4th 432, 439.) Where there is sufficient legal ground in the record to support the trial court's order, the order may be upheld regardless of the grounds relied upon by the trial court. (*Becerra v. County of Santa Cruz* (1998) 68 Cal.App.4th 1450, 1457.) We must affirm on any ground supported by the record.

11

(*Jimenez v. County of Los Angeles* (2005) 130 Cal.App.4th 133, 140.)[3]

The second prong of the anti-SLAPP analysis requires QCS to show a probability of prevailing on its causes of action. The court ruling on such a motion does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether QCS has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment if the evidence is credited. The court accepts QCS's evidence as true and evaluates Sahakian's showing only to determine if it defeats QCS's claim as a matter of law. (*Baral*, *supra*, 1 Cal.5th at pp. 384-385; *Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.) "[A]t the second stage of an anti-SLAPP hearing, the court may consider affidavits, declarations, and their equivalents if it is reasonably possible the proffered evidence set out in those statements will be admissible at trial." (*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 949.) "[C]laims with the requisite minimal merit may proceed." (*Navellier v. Sletten*, *supra*, 29 Cal.4th at p. 94.)

### 1. *The Legal Framework*

"The tort of defamation 'involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage.' (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 529, p. 782, citing Civ. Code, §§ 45-46 and cases.)" (*Taus v. Loftus* (2007) 40

---

[3] While these cases address appellate review of the granting of summary judgment motions, the same principle is applicable to de novo review of a special motion to strike under section 425.16.

12

Cal.4th 683, 720.) "Defamation is effected by either of the following: [¶] (a) Libel. [¶] (b) Slander." (Civ. Code, § 44.) "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.) "A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face." (Civ. Code, § 45a.)

"Slander is a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which: [¶] 1. Charges any person with crime, or with having been indicted, convicted, or punished for crime; [¶] . . . [¶] 3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits; [¶] . . . or [¶] 5. Which, by natural consequence, causes actual damage." (Civ. Code, § 46.) Statements in these categories are considered slanderous per se, and actionable without proof of special damage. (*Burrill v. Nair* (2013) 217 Cal.App.4th 357, 382, disapproved on other grounds in *Baral, supra*, 1 Cal.5th at p. 395, fn. 11.)

### 2. *QCS's Evidence Under Prong 2*

QCS alleges the required elements described above in its complaint. We focus on the evidence submitted by QCS in opposition to Sahakian's anti-SLAPP motion.

13

### a. Declaration of Rick Landi

The declaration submitted by Rick Landi stated as follows: Rick Landi is the owner of QCS, and has personal knowledge of the matters set forth. QCS is a licensed general contractor in California. QCS has been contracted to perform various repair and maintenance projects at CPV since 2012. At all times while working on the CPV property, QCS has maintained an active contractor's license and all required insurance.

In 2013, QCS began a large project to replace all of the hot and cold water pipes within each unit at the CPV complex, replace the vertical cast iron sewer drain pipes, paint the entire complex, and replace all of the wood railings on the balconies with welded and painted steel. Prior to being awarded the contract for this work, QCS submitted estimates for the work to the HOA board. QCS was awarded the contract as it was the lowest bidder for the project. This project was completed within budget and on schedule.

While completing that project, if QCS was responsible for causing any damage to a unit, QCS repaired that damage at its own expense.

As a result of the false statements that have been spread by Sahakian, QCS was prevented from completing work that it had been contracted to perform at CPV and has lost the opportunity to perform future work at the property. QCS's reputation within the community has been damaged as a direct result of false statements made by Sahakian.

In the construction industry, a contractor's reputation is an extremely important factor when trying to secure contracts for future work. QCS has lost approximately $125,000 and may

14

continue to suffer damage in the future as a result of Sahakian's intentional misrepresentations concerning QCS.

When QCS became aware of the false statements being spread throughout the CPV community, QCS provided information to Sahakian to rebut his claims. This included providing licensing and insurance information which Sahakian proclaimed QCS did not have. Even after receiving this information Sahakian continued to spread the misinformation and outright lies.

## b. Declaration of Phillip DeSautell

The declaration submitted by Phillip DeSautell stated as follows: DeSautell has owned a condominium in the CPV complex since 2012. He has worked in the construction industry for over 30 years and is familiar with construction relating to large complexes and buildings. He has personal knowledge of the matters set forth in the declaration. He served on the HOA board from 2013 to 2018, and was president from 2015 to 2018. During his time on the board, he helped to oversee several construction and maintenance projects, as well as any corresponding special assessments for the homeowners.

The HOA used a construction consultant, Jerry Acker, to assess and review the construction and maintenance needs at the property, obtain and review bids from contractors, negotiate bids and contracts, inspect work during and after projects, and act as a liaison between the HOA and any contractors performing work. During DeSautell's time on the board, the HOA contracted with QCS for several projects, including plumbing, painting, repairs to balconies, in addition to regular maintenance work. The overall quality of QCS's work was good.

15

In mid-2017, Sahakian began a campaign within the HOA to disparage the board and QCS. Since then, DeSautell has personally witnessed Sahakian tell several homeowners, in person and in writing, that QCS does not have a contractor's license, does not carry workmen's compensation insurance, and performs substandard work. The statements have been made both in and out of official association meetings. Sahakian has on several occasions posted notices containing these statements on doors within the complex and has sent emails with these statements to owners. In addition, Sahakian has told homeowners that QCS was hired for projects that were never put out for bid and that QCS was awarded the projects even though its estimates were not the lowest. However, QCS was awarded all of its contracts based on it being the lowest bidder. The HOA board would attempt to obtain at least 3 bids on all the work performed at CPV.

Sahakian stated to the homeowners that an audit had been completed and it was discovered that approximately $1.1 million was wrongfully paid to QCS and that he was going to get QCS to repay that money to the HOA. The "audit," however, was simply a report totaling amounts paid to QCS over a period of time and the auditor did not make a conclusion that the money was wrongfully paid.

Sahakian sent out a letter to all of the owners at CPV (which is attached to the declaration) that contained false statements regarding QCS's work as it related to a special assessment in 2013. DeSautell, as president of the CPV HOA board during the entire time of all of QCS's work on the special assessment, states unequivocally that QCS did good quality workmanship work, as required by its contracts. Sahakian

16

stated, "On numerous occasions units were damaged by QCS, who refused to fix things at their expense." However, if there was any damage caused by QCS during the repairs, QCS repaired all damages at its cost and each owner signed a form upon completion of the work stating that all of the required repairs had been completed. Sahakian also stated, "Due to poor planning, management, and cost overruns, the 2013 assessment was insufficient to pay for the entire piping project." However, the project was completed on schedule and within budget. Sahakian has been informed on multiple occasions by DeSautell, other members of the former board, and individuals at QCS that the statements he has made regarding QCS are not true, yet Sahakian has continued to make the statements and spread misinformation around the community.

### c.   Declaration of Brad Chisler

The declaration submitted by Brad Chisler stated as follows: Chisler has owned a condominium unit at CPV since 2014. He has been a project manager supervisor for the Community Development Commission in Los Angeles County since 2008 and is familiar with construction relating to large complexes and buildings. He has personal knowledge of the matters set forth in the declaration.

Chisler served on the contracts committee for the HOA from 2014 to 2017. Chisler's tasks on the contracts committee included helping to oversee maintenance and repair work at CPV, with the largest responsibility being to help manage large construction projects that were undertaken with funds from a special assessment of the homeowners from 2013. Chisler would generally meet bi-monthly with Jerry Acker (the HOA's construction consultant), Scott Long (the on-site property

17

manager), and Rick Landi and/or other individuals from QCS. These meetings would go over QCS's scope of work, review QCS's completed work, review estimates and billings, and discuss any concerns or complaints related to the ongoing construction projects at the property.

Chisler has personally witnessed Sahakian tell homeowners, in person and in writing, that QCS does not have a contractor's license, does not carry workmen's compensation insurance, and performed work for the HOA without a contract and without bidding. Sahakian has on several occasions posted notices containing these statements on doors within the complex and has sent emails with the statements to owners.

Sahakian sent an email to Chisler and other unit owners (attached as an exhibit to the declaration) stating that an investigation of the HOA finances had been completed and that it "concluded that about $1.2 million of HOA funds was spent by previous boards over a period of three years, without contract and often with no bidding, exclusively on [QCS]." It also stated that "[f]urther investigations on the legal front determined potentially serious issues with licensing and overcharging by QCS." A subsequent email from Sahakian to unit owners (also attached as an exhibit to the declaration) again states that the "audit" found that QCS was awarded work without contracts and without bidding. Sahakian's statements have resulted in the termination of QCS's work for the HOA at CPV.

3. *QCS Has Sufficiently Shown a Probability of Prevailing*

On this record, QCS has shown a probability of success sufficient to defeat Sahakian's claim that the suit lacks even minimal merit. QCS has submitted competent evidence (which

18

we must take as true in this setting) to demonstrate (a) publication of oral and written statements about QCS by Sahakian (which he does not dispute), (b) the falsity of those statements, (c) the defamatory character of those statements, (d) the absence of any applicable privilege, and (e) the injury to QCS therefrom.

QCS has sufficiently demonstrated both libel per se and slander per se.  For example, Sahakian's assertions that QCS has worked without a valid contractor's license constitute accusation of criminal conduct, as it would be a misdemeanor for QCS to do so.[4]  Similarly, failure to carry workers' compensation insurance, as asserted by Sahakian, is also a misdemeanor.[5]  QCS has also submitted evidence of other false assertions published by Sahakian concerning QCS and its work for CPV that would tend

[4] Business and Professions Code section 7028, subdivision (a)(1), states in pertinent part:  "(a)  Unless exempted from this chapter, it is a misdemeanor for a person to engage in the business of, or act in the capacity of, a contractor within this state under either of the following conditions:  [¶]  (1)  The person is not licensed in accordance with this chapter."

[5] Labor Code section 3700.5, subdivision (a), provides:  "The failure to secure the payment of compensation as required by this article by one who knew, or because of his or her knowledge or experience should be reasonably expected to have known, of the obligation to secure the payment of compensation, is a misdemeanor punishable by imprisonment in the county jail for up to one year, or by a fine of up to double the amount of premium, as determined by the court, that would otherwise have been due to secure the payment of compensation during the time compensation was not secured, but not less than ten thousand dollars ($10,000), or by both that imprisonment and fine."

to injure it in its business within the meaning of Civil Code sections 45 and 46.

Thus, QCS has met its burden of showing its defamation claims have " 'minimal merit' sufficient to defeat an anti-SLAPP motion." (*Monster Energy Co. v. Schechter*, *supra*, 7 Cal.5th at p. 796, quoting *Oasis West Realty, LLC v. Goldman*, *supra*, 51 Cal.4th at p. 825.) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten*, *supra*, 29 Cal.4th at p. 89.)

We emphasize that our conclusion as to the satisfaction of prong 2 for purposes of this motion does not imply any view as to QCS's ultimate ability to prove its claims in this action.[6]

---

[6] Section 425.16, subdivision (b)(3), provides: "If the court determines that the plaintiff has established a probability that he or she will prevail on the claim, neither that determination nor the fact of that determination shall be admissible in evidence at any later stage of the case, or in any subsequent action, and no burden of proof or degree of proof otherwise applicable shall be affected by that determination in any later stage of the case or in any subsequent proceeding."

20

## DISPOSITION

The trial court's denial of the anti-SLAPP motion is affirmed.  QCS shall recover its costs on appeal.

NOT TO BE PUBLISHED

SINANIAN, J.*

We concur:


ROTHSCHILD, P. J.


BENDIX, J.

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## APPENDIX
Letter from Sahakian

"Dear neighbor,

"We write to you on behalf of a small group of owners that have recently grown concerned about our Cordova complex and the operations of our HOA. We greatly value the service of our HOA Board members who have volunteered to do an often thankless job representing our collective interests. However, several recent developments suggest that we have inadvertently entered a mode of operation that is not necessarily in the best interest of all the owners and the long term health of our HOA. To be specific, we point out a short list of issues of concern:

"- In 2012, an **$10-15,000 per unit** cost was incurred on the owners through an assessment to replace all pipes across all units. It has become evident since then that the contractual terms and subsequent work, done by QCS, were associated with several shortcomings and had ended up costing the HOA more than originally planned.

"- In a rather short time after this large assessment, there is now talk for another **$20,000 per unit** assessment that lumps together a bunch of improvements: some of these may be of urgent need, such as proper termite treatment, while others, such as replacing all of the plants, seem to have a significant cosmetic component, and yet would constitute the bulk of the cost.

"- In recent years, **QCS** has been almost exclusively contracted for all repairs, yet their service has not always been adequate. For example, sometimes units have incurred damages during and because of these repairs, and these damages have not been addressed. Additionally, these repairs are done at a very slow pace– often at great inconvenience to owners/tenants and sometimes leading to more repairs and cost for the HOA. In some cases, the work has even been substandard and/or did not address the problem at hand. Some of us have noticed waste in

material and supplies. In one Instance, an owner independently obtained bids on the exact same repairs: the estimate QCS gave was almost two times costlier than that of two other reputable companies, and QCS asked for thrice the time to complete the work.

"There are undoubtedly other issues to list, and we hope to collect and document them with your help. The purpose of this letter is, however, not to criticize but to offer constructive advice to the HOA Board on how to proceed in the future. We would like to draft a letter to the Board with the help of all owners interested in contributing their suggestions. This letter would then be signed by the majority of the owners. The goal is to avoid future frustration and potential legal challenges by the owners/tenants that would invariably end up costing all of us.

"***On the back of this page*** *is the first rough draft of the letter, compiled by just* a *few of us. We would like to ask you to review it and, if you have any suggestions, to either send them to us electronically or make them in person at an upcoming meeting (please* see *the details below).*

"The goal is to draft a document that most of us would sign, and to present to the Board as a set of recommendations and guidelines. The letter can properly document our concerns and provide meaningful and concrete suggestions on which the Board can act. Given the challenges that the Cordova complex faces in the near future, we feel drafting such a comprehensive letter is important and to the benefit of all those invested in this complex.

"Thank you for reading this letter, and we look forward to hearing from you all.

"Recommendations to the HOA Board on behalf of the owners regarding future operations of the HOA (*draft*):

"- Any repair work costing more than $4,000 (the common minimum for contract work in the area) should include at least *two* independent bids, as opposed to being accorded to QCS by default. The bid details should be made public and available to any owner to inspect. In choosing the winning bid, consideration should be given not only to the cost, but also to the proposed duration of the work. This is intended to minimize inconvenience to the owners. To minimize logistical overhead, perhaps it might be best for the HOA to work regularly with 3-4 contractors. Contracting only QCS for most repair work, while being convenient, is not working well anymore. The Board may want to also consider one or more on-site and competent handy-people invested *only* in Cordova to address most minor jobs. All repairs should be inspected afterwards. If it is found that the job was not done properly, the issue should be addressed by the contractor(s).

"- Any major repair contract should include a warranty. Contracts should stipulate that any damage to an owner's property caused by construction workers should be repaired by the construction company at no additional cost to the HOA.

"- Unless in case of an emergency, the owners cannot be required to give keys to their units to a construction company. Access to a unit's common area—unless it is an emergency—should be arranged in close coordination with the owners involved; the scheduling must not be unreasonably inconvenient to the owners.

"- Future assessments of significant repairs/improvements to our complex should be presented as one assessment per one issue, as opposed to lumping several projects into one vote item. This will allow the owners to target their votes more carefully. A single voting ballot may include, when needed, several assessment items with separate voting on each item.

"- If an assessment does not receive majority vote, the Board should not fall back on raising HOA fees as a means to pay for a project that was not supported by a majority of the owners. A negative vote has meaning, and is an indication of the will of the HOA. A negative vote suggests further discussion is needed, and reevaluation of the priorities and details of the project is in order.

"- No person or company can be contracted to work on the complex if the person or the head of the associated company is a relative of any Board member.

"- To increase transparency, the monthly Board meeting minutes, along with a monthly detailed record of all bids, construction costs, and assessments should be emailed to all owners of Cordova.

"This is only a first draft, and we welcome any and all recommendations from the owners.

"To provide suggestions/comments:
- Electronically, go to https://[xxx].herokuapp.com.

"You will be asked a username/password to log in.  Use . . . for username, and . . . for password.

"- In person, please come to the owners' meeting we are organizing on **Sunday, July 9th** at **2pm**, at the Recreation room.

"With kind regards,
"Vatche Sahakian and Julie Sushytska, . . . on behalf of a group of concerned owners.

"For direct email contact, use . . . ."