Filed 12/18/20  Rubin v. Kessler CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JASON P. RUBIN, as Trustee, etc.,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>WARREN J. KESSLER, Individually and as Trustee, etc., et al.,<br><br>Defendants and Appellants. | B301967<br><br>(Los Angeles County Super. Ct. No. BC720451) |

APPEAL from an order of the Superior Court of Los Angeles County.  Robert S. Draper, Judge.  Affirmed.

Nemecek & Cole, Frank W. Nemecek, Mark Schaeffer and Jonathan M. Starre for Defendants and Appellants.

Gould Law, Howard N. Gould; Mokri Vanis & Jones, Richard W. Vanis, Jr., Matthew J. Eschenburg; Esner, Chang & Boyer and Stuart B. Esner for Plaintiff and Respondent.

_____

Warren and Joan Kessler[1] appeal from the trial court's denial of their motion to strike under Code of Civil Procedure section 425.16 (the anti-SLAPP statute), and accompanying award of attorney fees.[2] The Kesslers and respondent Rubin[3] are neighbors. Rubin owns an easement for a sewer on the Kesslers' property.

When Rubin sought to build a new, bigger house on his property in 2014, the Kesslers opposed Rubin's permit requests. After the City of Los Angeles (City) approved the project, the Kesslers filed a petition for a writ of mandate against the City, naming Rubin as a real party in interest. Rubin and the Kesslers settled that action in 2015.

As part of the settlement, Rubin agreed to pay $25,000 to reimburse the Kesslers' lawyers; the Kesslers agreed to dismiss the mandamus proceeding; and both sides agreed to a release. The Kesslers also agreed that Rubin could proceed with his home construction and agreed not to challenge Rubin's permits based on existing plans.

Several years later Rubin sought access to the easement to complete his house. His plumbers mistakenly cut the Kesslers'

[1] Warren and Joan Kessler were sued as individuals and as trustees of their family trust, which holds title to their home. We refer to all appellants collectively as the Kesslers.

[2] Subsequent undesignated statutory references are to the Code of Civil Procedure. "SLAPP" is an acronym for "[s]trategic lawsuit against public participation." (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1109, fn. 1.)

[3] Jason Rubin filed this action in his capacity as trustee of the trust that owns his home. The form of title is not at issue in this appeal, and we therefore refer to him simply as Rubin.

water line, prompting the Kesslers to deny further access to the easement. Rubin filed this lawsuit and obtained a preliminary injunction requiring the Kesslers to allow access.

The Kesslers opposed the preliminary injunction in part by arguing that Rubin had forfeited his easement because he had abused his easement right. They filed a cross-complaint seeking to nullify the easement based upon similar grounds. Both the injunction opposition and the Kesslers' cross-complaint claimed that Rubin's abuse of the easement included events that occurred prior to the settlement. Rubin responded with a first amended complaint (FAC) alleging that the Kesslers had breached the settlement agreement by raising those claims.

The Kesslers filed an anti-SLAPP motion seeking to strike that cause of action along with some other language in the FAC, arguing that the challenged portions of the FAC arose from the Kesslers' protected petitioning conduct. The trial court denied the motion and awarded Rubin $33,060 in attorney fees on the ground that the Kesslers' motion was frivolous and designed solely to cause delay and expense.

We affirm. The language that the Kesslers sought to strike from the FAC supported only Rubin's claim for breach of the settlement agreement. Although that claim arose from protected petitioning conduct—i.e., the Kesslers' pleadings in this action— the likelihood that Rubin would succeed on his claim was apparent from the face of the Kesslers' own pleadings. The trial court therefore did not err in denying the Kesslers' anti-SLAPP motion and did not abuse its discretion in finding that the Kesslers' motion was frivolous and filed for the purpose of delay.

3

# BACKGROUND

## 1. The Parties' Prior Dispute

Rubin and the Kesslers are neighbors on Skylark Lane, north of Sunset Boulevard in Los Angeles. Rubin has the right to a sewage easement on the Kesslers' property. The easement has existed for about 60 years.

When Rubin sought to build a new house on his property in 2014, the Kesslers opposed Rubin's request for City approval. Warren Kessler appeared before the City's Board of Building and Safety Commissioners (Board) and before the Los Angeles City Council to testify against Rubin's construction and submitted correspondence in opposition. Among other things, Warren Kessler wrote a letter to the Board in October 2014 asking the Board to consider "the impact of the project on the Applicant's sewer lines running the property of the [Kesslers]." Warren Kessler stated that he "will not agree, and is not required under law to agree, to any increased burden in the use of the sewer easement resulting from the increased size of the Applicant's residence."

Warren Kessler also claimed that, "[i]n 2010, the Applicant's sewer lines cracked and sewage went on to Skylark Lane. One of the neighbors, over the course of at least one month, asked the Applicant on numerous occasions to repair the damage. The Applicant did not make the repairs until the neighbor threatened to call the Health Department."

After Rubin had obtained City approval for his construction, and while Rubin was awaiting various building permits, the Kesslers filed a petition for a writ of mandate (Petition), naming the City as a respondent and Rubin as a real party in interest (the Writ Action). Among other things, the

4

Petition alleged that, in seeking City approval, Rubin misrepresented the width of Skylark Lane and misleadingly referred to Skylark Lane as a public street. The Petition alleged that the City had violated the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) and the Los Angeles Municipal Code in approving Rubin's construction. It sought an order requiring the City to set aside approvals for Rubin's project.

The Kesslers sought a preliminary injunction. In support of the injunction, Warren Kessler submitted a declaration suggesting that Rubin had misrepresented the size of his planned new residence.

The court denied the preliminary injunction. Rubin and the Kesslers then agreed to settle their dispute.

## 2. The Settlement Agreement

Rubin and the Kesslers entered into a written settlement agreement dated October 26, 2015 (Settlement Agreement). As part of the agreement, Rubin agreed to pay $25,000 toward the Kesslers' attorney fees. The Kesslers agreed to dismiss the Writ Action and to refrain from further challenges to Rubin's construction based on his existing plans. Both parties agreed to a mutual release.

In a section entitled "Recitals," the Settlement Agreement explained the parties' intention with respect to the scope of the release. It stated that "the Parties intend to settle, compromise and release any and all claims, counterclaims and offsets among them, including any claims they have or may have against the other arising out of, based upon, or involving any occurrences, events, omissions or conduct that were or could have been asserted in the Lawsuit [i.e., the Writ Action] from the beginning of time through and including the date of execution of this

5

Agreement." The mutual release itself provided that the parties released each other from "any and all claims, suits, rights, actions, complaints, liabilities, obligations, promises, agreements, contracts, common law or statutory torts, causes of action, demands, costs, losses, damages, debts, and expenses (including attorney's fees and costs) of any nature whatsoever, whether known or unknown, whether suspected or unsuspected, whether disclosed or undisclosed, whether contingent or vested, which the Parties ever had, now have, or may claim to have, against the Releasees, or any of them, from the beginning of time to the date of execution of this Agreement by reason of any act, event, or omission concerning any matter, cause, thing, or claims related to, or arising out of, or based on the conduct or omissions of the Releasees, and any of them, related to the Lawsuit." In addition to the release itself, the Settlement Agreement also contained a separate paragraph in which the parties promised that they would not "commence, aid in any way, prosecute or cause to be commenced or prosecuted, any action or other proceeding based upon any claims, demands, causes of action, obligations, damages or liabilities" that were released in the Settlement Agreement.

In other paragraphs in the Settlement Agreement, the Kesslers acknowledged that Rubin would "continue with all approved construction activities based on the City approved plans and currently outstanding building and related permits," and agreed to "not challenge any outstanding building and related permits based on the plans, applications, reports, and other submissions that were made prior to the issuance of the building and related permits" for Rubin's new residence.

Rubin also agreed that he would "restore the landscaping on the hillside across from the Kesslers' garage to its condition

6

prior to the removal of such vegetation in or about July 2015 and will remove the fence."

### 3. Events in 2018

As Rubin's work on the construction proceeded, on August 2, 2018, Rubin's counsel notified the Kesslers of the need to repair the sewer line on the Kessler's property to complete the project. The Kesslers responded by requesting more information about the intended repair and the City's requirements. The Kesslers also stated that "under no circumstance will we agree to any overburdening or other expansion of the easement." They advised that, "under California law, any action on your client's part other than repair and maintenance of the existing sewer line would overburden and expand the easement," and stated that they were "prepared to take all appropriate legal action to protect our property rights."

In subsequent correspondence, the Kesslers claimed that Rubin had failed to comply with the provision in the Settlement Agreement requiring him to replant the hillside in front of the Kesslers' house. They alleged that Rubin's motives were "vindictive" and advised that they would not permit any repairs to the sewer line until Rubin "plants the hillside across from our house and installs and operates sprinklers." They demanded assurances that "the current sewer line crossing our property will be repaired but not enlarged" and warned that "[n]o work will begin unless and until you have addressed all of the highlighted issues set forth in this email. We are in the process of making arrangement to hire armed security guards to prevent any improper trespass onto our property by your client if this matter is not resolved."

7

Following some additional correspondence, the Kesslers eventually agreed that the repair work could go forward. However, while conducting the repair, Rubin's plumbers damaged the Kesslers' water line and then repaired it without purging the system of dirt and air and without informing Kessler. The damage caused dirty water to come out of the Kesslers' plumbing.

Following that event, the Kesslers told Rubin's counsel that they would not permit further work on the sewer line until the damage to the water line was repaired to their satisfaction and the line had been inspected by a building or health inspector. The Kesslers also demanded that they be reimbursed for their out of pocket costs from the event, including the cost of their temporary relocation to the "Four Seasons, Peninsula, or a similar hotel."

The parties communicated further about plans to repair the water line, but their negotiations broke down. The Kesslers hired counsel and continued to refuse Rubin access to the sewer line while claiming that Rubin had forfeited his right to the easement. The Kesslers moved to a hotel and made arrangements to replace their entire water line.

### 4.    Initial Proceedings in the Trial Court

Rubin filed his complaint in this action on September 4, 2018. Along with the complaint he filed a request for a temporary restraining order (TRO) and a preliminary injunction requiring the Kesslers to permit access to the easement so that Rubin could complete the sewer repair. Rubin's complaint alleged causes of action for an injunction and damages for interference with the easement as well as a cause of action for nuisance.

8

The trial court denied the TRO and set the preliminary injunction for hearing.

In support of his request for a preliminary injunction Rubin testified that the only remaining impediment to moving into his new house was completion of the repairs to the sewer line. He explained that he had a newborn child who had been born prematurely and that the infant required a " 'stable, equipped home' " when she was able to leave the hospital.

In opposing the preliminary injunction, the Kesslers argued that Rubin had forfeited his right to the sewer easement. Their opposition discussed the 2018 damage to their water line along with Rubin's alleged "past instances of easement abuse." Those past instances allegedly included the prior sewage leak onto Skylark Lane as well as Rubin's alleged misrepresentations to the City concerning (1) the size of his new house, (2) the width of Skylark Lane, and (3) whether Skylark Lane was a public street. In identifying the events justifying forfeiture, the Kesslers specifically mentioned Rubin's conduct in "razing the 3,500 square foot house that was on the Rubin Property and replacing it with a home 5 times larger" and "increasing the amount of sewage that will burden the easement." The Kesslers concluded their argument by claiming that, "[i]f nothing else, Rubin's past misconduct of disregarding the dumping of human waste on Skylark Lane demonstrates the likelihood of harm to the Kesslers."

The trial court (Judge Chalfant) granted the preliminary injunction on October 16, 2018. The court rejected the Kesslers' argument that Rubin had forfeited his easement as "spurious." The court found that "[t]he Rubin sewer line is and will continue to be a sewer line for a single family residence. Rubin's new

home may have a much larger square footage, but the sewer line is still burdened only by a single family's usage."

The court noted that part of the Kesslers' opposition to the injunction was "based on the parties' history." In addition to the 2018 water line rupture, that history included "Rubin's construction of an 11,000 square foot home to replace the previous approximately 3500 square foot home," and the prior "sewer line disruption in which human feces and toilet paper was dumped on Skylark lane." The court concluded that "[t]his history explains the parties' antipathy and the Kesslers' distrust of Rubin," but did not provide a basis "to preclude Rubin from exercising his legal right to access to the Rubin Easement to conduct the required repairs."

The court also observed that "[i]t seems apparent that the Kesslers overreacted to the break in their water line, which was an annoyance and not a health hazard. Nor was it . . . reasonable for the Kesslers to move out of their home, stay in a hotel, and replace their entire water line."

The Kesslers appealed from the preliminary injunction ruling, but abandoned their appeal nine days later.

In early October 2018, the Kesslers filed a cross-complaint, followed several months later by a first amended cross-complaint (collectively, the Cross-Complaint). The Cross-Complaint contained a cause of action for "extinguishment of easement." That cause of action alleged that Rubin had "forfeited and extinguished" his easement "by abusing the easement and unduly burdening the Cross-Complainants' property, namely through his history of spilling sewage, performing unpermitted repair work, gaining access to the Kessler Property under false pretenses, substantially increasing the capacity of sewage flow through the

10

Rubin Sewer Line by increasing the size of the Rubin house, changing the nature and conditions of the dominant tenement, causing destruction on the servient tenement, rupturing the Kessler Water Line and improperly repairing it, and by concealing the rupture of the Kessler Water Line and inadequate repair.  By burdening the sewer line with a significantly larger new house with substantially greater sewage needs than the previous house, they are abusing the easement by risking damage to both the area of the easement and the Cross-Complainant's [*sic*] surrounding property."

Rubin responded with a first amended complaint (FAC).  The FAC updated the allegations in the original complaint by stating that the Kesslers had permitted completion of the sewer work after the trial court had granted the preliminary injunction.

The FAC also added a new cause of action for breach of the Settlement Agreement.  Rubin alleged that the Kesslers had breached the agreement by asserting claims in their opposition to the preliminary injunction and in their Cross-Complaint that they had agreed to release.[4]

5.	**The Anti-SLAPP Motion**

The Kesslers responded to the FAC with an anti-SLAPP motion.  The motion argued that new language in the FAC challenged their protected petitioning conduct.  The motion sought to strike:  (1) portions of two paragraphs in Rubin's cause of action for interference with easement (discussed further below)

---

[4] The Kesslers dismissed their Cross-Complaint without prejudice shortly after Rubin filed his motion for leave to amend the complaint.

11

and (2) Rubin's entire cause of action for breach of the Settlement Agreement.

The trial court (Judge Draper) denied the motion. The court found that, although the FAC mentioned protected petitioning conduct, Rubin's claims were not based on that conduct. With respect to the cause of action for breach of the Settlement Agreement, the court concluded that the "gravamen" of the claim was that the "Kesslers breached the settlement agreement by not allowing Rubin to access the sewer easement." The court found that "the instant lawsuit arises out of enforcement of the Settlement Agreement, not out of the Kesslers' speech in filing the previous . . . case or other filings. Rubin did not sue the Kesslers because they engaged in protected speech, but because they breached the Settlement Agreement."

The court also granted Rubin's request for an award of attorney fees and costs. The court found that the Kesslers' motion was "both frivolous and solely designed to cause unnecessary delay and expense." The court concluded that our Supreme Court's decision in *Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781 (*Monster Energy*) (discussed further below) clearly established that the Kesslers' motion was without merit and the filing of the motion caused unwarranted delay because it automatically stayed proceedings in the trial court. The court awarded Rubin $33,060 in costs and attorney fees.

## DISCUSSION

### 1. The Anti-SLAPP Procedure

Section 425.16 provides for a "special motion to strike" when a plaintiff asserts claims against a person "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the

California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).) Such claims must be stricken "unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (*Ibid*.)

Thus, ruling on an anti-SLAPP motion involves a two-step procedure. First, the "moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 396 (*Baral*).) At this stage, the defendant must make a "threshold showing" that the challenged claims arise from protected activity. (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056 (*Rusheen*).)

"A claim arises from protected activity when that activity underlies or forms the basis for the claim." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1062 (*Park*).) In determining whether protected activity forms the basis for a claim, "courts should consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability." (*Id.* at p. 1063.) In doing so, courts should make a " 'careful distinction between a cause of action based squarely on a privileged communication, such as an action for defamation, and one based upon an underlying course of conduct evidenced by the communication.' " (*Id.* at p. 1064, quoting *White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870, 888.) Assertions that are merely incidental or collateral are not subject to a motion to strike under section 425.16. (*Baral, supra,* 1 Cal.5th at p. 394.) "Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute." (*Ibid.*)

13

Second, if the defendant makes the required initial showing, the "burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated." (*Baral*, *supra,* 1 Cal.5th at p. 396.) Without resolving evidentiary conflicts, the court determines "whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment." (*Ibid*.) The plaintiff's showing must be based upon admissible evidence. (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212.) If the plaintiff's showing is insufficient, the "claim is stricken" and "[a]llegations of protected activity supporting the stricken claim are eliminated from the complaint, unless they also support a distinct claim on which the plaintiff has shown a probability of prevailing." (*Baral,* at p. 396.)

Section 425.16, subdivision (e) defines the categories of acts that are in " 'furtherance of a person's right of petition or free speech.' " Those categories include "any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law" and "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." (§ 425.16, subd. (e)(1)–(2).)

An appellate court reviews the grant or denial of an anti-SLAPP motion under the de novo standard. (*Park, supra,* 2 Cal.5th at p. 1067.)

**2. The Challenged Portions of Rubin's FAC Support Only His Claim for Breach of the Settlement Agreement**

Consistent with the procedure outlined above, we must first consider the portions of the FAC that the Kesslers sought to strike to determine (1) whether they allege protected activity and (2) whether that activity provides the basis for any claim for relief. As mentioned, the Kesslers' motion specifically identified the portions of the FAC that they asked to be stricken. We consider each identified portion below.

**a. *Paragraph 16 Excerpt***

The Kesslers sought to strike a portion of paragraph 16 in the FAC. That paragraph appeared in Rubin's first cause of action for injunctive relief based on the Kesslers' alleged interference with Rubin's easement. The challenged portion of the paragraph (the Paragraph 16 Excerpt) alleged that "[d]espite [the Kesslers'] promises in the written settlement agreement, an[d] in breach of that agreement, the Kesslers again raised those false allegations in their current efforts to force Mr. Rubin to move his sewer line off of [their] Property. Those efforts kept the Rubin family out of their house for approximately one and one-half months causing Mr. Rubin emotional upheaval and distress throughout that period of time. The Kesslers continued those efforts even after learning that Mr. Rubin's new child had been born three months premature and in Kansas City, Kansas, making the need to occupy his new home, establish a stable household for his older daughter, and prepare the new home for that premature newborn even more crucial."

The Kesslers claim that the Paragraph 16 Excerpt alleges injury from Rubin's "litigation court filings." The Kesslers

15

correctly point out that statements in court filings are protected petitioning conduct. (See *Rusheen, supra,* 37 Cal.4th at p. 1056.)

We note initially that paragraph 16 does not specifically identify any statements made in court filings. That paragraph first refers to the Kesslers' promise in the Settlement Agreement not to use their "prior claims and assertions" in "any later legal challenges." In the challenged excerpt, the paragraph then generally alleges that the Kesslers "again raised those false accusations." It does not specify that the Kesslers raised the allegations in litigation filings rather than in some other context in the parties' dispute, such as statements accompanying the Kessler's refusal to allow Rubin access to the easement.

In any event, even assuming that the Paragraph 16 Excerpt does refer to statements made in litigation or in protected prelitigation communications, the only *claim* that those statements support is Rubin's claim for breach of the Settlement Agreement. The Paragraph 16 Excerpt expressly alleges that the Kesslers raised their prior claims "[d]espite [their] promises in the written settlement agreement, *and in breach of that agreement*." (Italics added.)[5] While that breach allegedly caused Rubin to incur the attorney fees that he sought to recover in his claim for breach of the Settlement Agreement, it did not cause the actual interference with Rubin's easement right that is the basis for his tort claims.

The elements of Rubin's tort claims support this conclusion. An unreasonable *interference* with Rubin's use of his easement is

---

[5] Rubin's claim for breach of the Settlement Agreement incorporates paragraph 16 by reference. So does his tort claim for nuisance.

an element of both Rubin's claim for interference with the easement and for nuisance. (*McCann v. City of Los Angeles* (1978) 79 Cal.App.3d 112, 116 [owner of a servient tenement was "not permitted to do to the surface of the land anything that unreasonably interferes with the sewer easement"]; *McBride v. Smith* (2018) 18 Cal.App.5th 1160, 1178 ["for a defendant's conduct to constitute a nuisance, the interference with use and enjoyment of land must be both substantial and unreasonable"].)

Paragraph 16 does not allege that the Kesslers' litigation statements themselves interfered with Rubin's use of his easement. They were part of the Kesslers' alleged course of conduct, but they did not themselves cause the delay that Rubin's tort claims identify as the injury that Rubin suffered. The Kesslers' *pleadings* did not delay Rubin's construction; the Kesslers' refusal to allow Rubin access to the easement did. The Kesslers' pleadings attempted, unsuccessfully, to explain and justify their conduct, but they did not cause it. The trial court succinctly described the nature of the Kesslers' interference with Rubin's easement in granting the preliminary injunction: "The Kesslers' *refusal to permit Rubin access to the easement* to make . . . repairs constitutes clear unreasonable easement interference in violation of Civil Code section 809." (Italics added.)

Thus, at most, the Kesslers' pleadings provided context for the " 'underlying course of conduct' " at issue in Rubin's tort claims. (*Park, supra,* 2 Cal.5th at p. 1064; see *Baral, supra,* 1

Cal.5th at p. 394.)  They did not themselves satisfy any element of those claims.[6]

### b. *Paragraph 19 Excerpt*

The Kesslers' motion challenged a portion of paragraph 19 in the FAC (the Paragraph 19 Excerpt).  The challenged portion stated that "[o]nly after this Court issued a preliminary injunction on October 16, 2018, and after the Kesslers appealed that ruling, and then abandoned the appeal, did the Kesslers, by letter dated October 26, 2018, advise Mr. Rubin that he would be allowed to complete the sewer work on October 27, 2018 or thereafter.  Such actions by the Kesslers prevented Mr. Rubin's use of his new house from on or about October 1, 2018 up to and through on or about November 15, 2018."

The only reference to litigation conduct in this excerpt is purely collateral to Rubin's claims.  The reference does not itself support any claim.

Paragraph 19 details the Kesslers' alleged interference with the easement.  It alleges that the Kesslers instructed Rubin and his contractors to "stay away" from the easement and "not to enter to finish the sewer repair work already underway and one

---

[6] Moreover, even if the Paragraph 16 Excerpt did support Rubin's tort claims, and even if Rubin failed to meet his step two burden to show that he was likely to prevail on those claims (an issue that we need not consider), the excerpt was still not subject to a motion to strike.  The Paragraph 16 Excerpt also supports Rubin's claim for breach of the Settlement Agreement.  A challenged claim may not be stricken if it "also support[s] a distinct claim on which the plaintiff has shown a probability of prevailing." (*Baral, supra,* 1 Cal.5th at p. 396.)  As discussed below, Rubin met his burden to show a probability of success on his claim for breach of the Settlement Agreement.

18

day form [*sic*] completion." It claims that this work was essential to complete construction of Rubin's residence so that he and his family could occupy it. It alleges that the Kesslers announced that they "were enforcing" their instruction to stay away from the easement, including by employing armed security guards. In the challenged excerpt, paragraph 19 then explains that the Kesslers permitted access to the easement only after the court had ordered them to do so.

The "actions" that prevented Rubin from using his house were the steps the Kesslers took to refuse access to the easement. The reference in the Paragraph 19 Excerpt to the injunction and abandoned appeal merely provides context to explain why that refusal ceased. As discussed above, the Kesslers' pleadings did not themselves cause Rubin's alleged harm from the denial of access. Rather, the cause of the harm was the Kessler's decision to refuse permission to complete work on the sewer until they were subject to a court order.

c. *Rubin's cause of action for breach of the Settlement Agreement*

The Kesslers sought to strike Rubin's fourth cause of action in its entirety for breach of the Settlement Agreement. They argue on appeal that Rubin's cause of action arises directly from the Kesslers' protected statements in the litigation. We agree.

Rubin's cause of action for breach of the Settlement Agreement is expressly based on the Kesslers' pleadings in this case. Rubin's FAC alleges that the Kesslers breached the Settlement Agreement by asserting claims "in this lawsuit." It repeatedly cites Warren Kessler's declaration in opposition to the preliminary injunction and the Kesslers' Cross-Complaint as the occasions for the breach. And it expressly alleges that the

19

Kesslers "have breached said Settlement Agreement by . . . opposing the preliminary injunction . . . and by filing the Cross-Complaint and First Amended Cross-Complaint in this action."

We therefore disagree with the trial court's conclusion that Rubin's cause of action for breach of the Settlement Agreement does not arise from protected activities. The Kesslers allegedly breached that agreement by engaging in protected litigation conduct.

In support of its conclusion, the trial court cited this court's decision in *City of Alhambra v. D'Ausilio* (2011) 193 Cal.App.4th 1301 (*D'Ausilio*). In that case, the City of Alhambra (Alhambra) filed a declaratory relief action to determine the scope of a prior settlement agreement with D'Ausilio in which D'Ausilio agreed not to engage in certain labor advocacy activities. Although Alhambra's declaratory relief claim was prompted by D'Ausilio's petitioning conduct that Alhambra believed breached the agreement, this court concluded that the claim did not *arise* from that protected conduct. Rather, it arose from "an actual, present controversy between the parties regarding the scope and enforceability" of the parties' settlement agreement. (*Id.* at p. 1307.)

This court subsequently distinguished *D'Ausilio* in a case with facts analogous to this case. In *Mundy v. Lenc* (2012) 203 Cal.App.4th 1401 (*Mundy*), the plaintiff (Mundy) sued Lenc for an alleged violation of the Americans with Disabilities Act (ADA; 42 U.S.C. § 12101 et seq.). Mundy had previously sued Lenc for other ADA violations, and had settled that litigation with an agreement releasing all claims that "were or could have been" asserted in the prior lawsuit. Lenc filed a cross-complaint in the

20

second action for breach of the settlement agreement, and Mundy responded with an anti-SLAPP motion.

This court held that Mundy met his burden to show that Lenc's cross-complaint arose from protected activity because the cross-complaint alleged that Mundy "breached the settlement agreement by filing a complaint against her in a second action." (*Mundy, supra,* 203 Cal.App.4th at p. 1408.)  The court concluded that *D'Ausilio* was inapposite, as "[t]he dispute in that case arose over the enforceability and scope of a settlement agreement" and "did not involve the filing of a lawsuit that resulted in the breach of a settlement agreement and general release." (*Id.* at p. 1409; see *Long Beach Unified School Dist. v. Margaret Williams, LLC* (2019) 43 Cal.App.5th 87, 98, fn. 6 [distinguishing *D'Ausilio* on the same ground].)

Like *Mundy*, this case involves the filing of a lawsuit (in the form of the Kesslers' Cross-Complaint) that allegedly breached a settlement agreement.  There is no exception to the anti-SLAPP statute for claims for breach of a settlement release. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 91–93 (*Navellier*).)  Thus, the Kesslers met their burden to show that Rubin's claim for breach of the Settlement Agreement arises from protected conduct.

On the other hand, like all other claims that arise from protected conduct, claims that challenge statements made during litigation may proceed if a plaintiff meets his or her burden to show a probability of success in the second step of the anti-SLAPP analysis.  (See *Navellier, supra,* 29 Cal.4th at p. 94 ["The Legislature's inclusion of a merits prong to the statutory SLAPP definition (§ 425.16, subd. (b)(1)) . . . preserves appropriate remedies for breaches of contracts involving speech by ensuring

21

that claims with the requisite minimal merit may proceed"]; *Mundy, supra,* 203 Cal.App.4th at pp. 1409–1411 [Lenc adequately demonstrated a probability of success on her cross-complaint for breach of the release in the settlement agreement].) We therefore proceed to consider whether Rubin met his step two burden.

**3.      Rubin Demonstrated a Probability of Success on His Claim for Breach of the Settlement Agreement**

In the second step of the anti-SLAPP analysis, Rubin has the burden to show that his claim for breach of the Settlement Agreement has the "minimal merit" necessary to defeat the Kesslers' anti-SLAPP motion. (*Navellier, supra,* 29 Cal.4th at p. 94; *Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 891.) Our inquiry in this stage of the analysis is limited to determining whether Rubin made a " ' "prima facie factual showing sufficient to sustain a favorable judgment." ' " (*Wilson,* at p. 891.) We accept Rubin's evidence as true and evaluate the Kesslers' showing " ' "only to determine if it defeats [Rubin's] claim as a matter of law." ' " (*Ibid.*)

Rubin easily meets this standard based upon the pleadings alone.

**a.      *Evidence of breach***

In the Kesslers' opposition to Rubin's motion for a preliminary injunction, the Kesslers argued that Rubin had forfeited his easement based, in part, on his conduct in "razing the 3,500 square foot house that was on the Rubin Property and replacing it with a home 5 times larger, and by increasing the amount of sewage that will burden the easement." They also argued that "Rubin's past misconduct of disregarding the

22

dumping of human waste on Skylark Lane demonstrates the likelihood of harm to the Kesslers."

Warren Kessler also raised Rubin's past conduct in his testimony opposing the injunction. Kessler testified that Rubin "misrepresented the size of the house he planned to build" when applying to the City for a permit for dirt removal. He claimed that Rubin "described Skylark Lane as being uniformly wider than, in fact, it actually was" and misrepresented that Skylark was a public street rather than a private street. And he asserted that, in about 2010, "before Mr. Rubin began the construction of his new residence" the Kesslers "became aware of toilet paper and human fecal waste on Skylark Lane in the vicinity of Mr. Rubin's sewer line," for which Rubin allegedly admitted responsibility. Kessler explained in his declaration that the Kesslers "have taken the position with Mr. Rubin in writing that given his course of dealing with us" has "led to the forfeiture of the sewer easement under California law." He stated that that course of dealing included the "human fecal contamination on Skylark Lane."

The Kesslers incorporated their claim for forfeiture of the easement into their Cross-Complaint. The Cross-Complaint reiterated the allegations about the sewage spillage in 2010 and Rubin's alleged misrepresentations about the size of his new house and the status of Skylark Lane as a public street. The Cross-Complaint's seventh cause of action for "extinguishment of easement" claimed that Rubin had forfeited the easement by abusing it and "unduly burdening" the Kesslers' property. That abuse allegedly included Rubin's "history" of spilling sewage, "substantially increasing the capacity of sewage flow through the

Rubin Sewer Line by increasing the size of the Rubin house" and "changing the nature and conditions of the dominant tenement."

In entering into the 2015 Settlement Agreement the Kesslers released all claims and rights, whether "disclosed or undisclosed," that were "related to, or arising out of" conduct related to the Writ Action. The Settlement Agreement specifically stated that the parties intended to release "any and all claims, counterclaims and offsets among them, including any claims they have or may have against the other arising out of, based upon, or involving any occurrences, events, omissions or conduct that were or could have been asserted in the [Mandamus] Lawsuit from the beginning of time through and including the date of execution of this Agreement." The Kesslers also acknowledged that construction on the Rubin's new house would continue; they agreed not to challenge any outstanding building permits; and they promised not to prosecute any "action or other proceeding" based upon the released claims.

As discussed above, the size of Rubin's new house and Rubin's alleged misrepresentations to the City were issues that arose in connection with Rubin's original request for City approval prior to the Settlement Agreement. The sewer leak on Skylark Lane also occurred prior to the construction of Rubin's new house and was part of the Kesslers' arguments to the Board opposing City approval of Rubin's construction.

The Kesslers do not dispute that the alleged 2010 sewage leak, Rubin's alleged misrepresentations to the City in connection with permit approvals, and the alleged increased burden on the sewer easement from Rubin's plan to build a larger house were claims that they released in the Settlement Agreement. Rather, the Kesslers simply assert that, while they referred to the history

24

of their dispute with Rubin in their litigation filings, those historical events were not the basis for any relief that they requested.

That assertion cannot be reconciled with the record of the Kesslers' own pleadings discussed above. The Kesslers sought forfeiture of Rubin's easement based in part on claims that were released in the Settlement Agreement.

The Kesslers also argue that they did not seek *any* relief from Rubin in their opposition to the preliminary injunction, which they characterize as purely "defensive." Again, that argument is inconsistent with the record of the Kesslers' own pleadings and testimony in opposition to the injunction, in which they claimed that Rubin had forfeited the easement. That claim was identical to their affirmative claim for "extinguishment" of the easement that they later asserted in their Cross-Complaint.

### b. *The litigation privilege*

The Kesslers' primary argument disputing the merits of Rubin's claim for breach of the Settlement Agreement is that the claim is barred by the litigation privilege. (See Civ. Code, § 47, subd. (b).) We reject the argument. The litigation privilege does not apply to a claim for breach of an agreement not to engage in particular speech or petitioning conduct.

In *Navellier* our Supreme Court rejected the argument that the anti-SLAPP statute provides " 'immunity' for breach of a release or of other types of contracts affecting speech." (*Navellier, supra,* 29 Cal.4th at p. 93.) The court held that, like other claims that arise from protected conduct, a plaintiff alleging a claim for breach of a release can defeat an anti-SLAPP motion by showing that the claim is likely to succeed. The court explained that "a defendant who in fact has validly contracted not to speak or

25

petition has in effect 'waived' the right to the anti-SLAPP statute's protection in the event he or she later breaches that contract." (*Id.* at p. 94.)

While the court in *Navellier* did not directly address the litigation privilege, its reasoning applies equally to the scope of the privilege. A defendant who contracts not to speak or petition waives protection from a claim of breach under the litigation privilege as well as under the anti-SLAPP statute. Otherwise, a defendant in a lawsuit to enforce contractually released claims could assert immunity for this petitioning conduct, which our Supreme Court explained such a defendant may not do.

A number of courts have recognized this. On remand from the Supreme Court in *Navellier*, the First District Court of Appeal rejected the argument that the litigation privilege applied to the plaintiff's breach of contract claim. (*Navellier v. Sletten* (2003) 106 Cal.App.4th 763, 773–774 (*Navellier II*).) The claim alleged that the defendant breached a release by filing a counterclaim in a prior federal lawsuit. (*Id.* at p. 768.) The court cited the waiver language in the Supreme Court's opinion and noted that, "[a]lthough the court was not addressing the litigation privilege, its discussion suggests that breach of contract claims like the one advanced here have potential merit." (*Id.* at p. 774.)

In *Wentland v. Wass* (2005) 126 Cal.App.4th 1484 (*Wentland*) the court held that the litigation privilege did not bar a claim for breach of contract based on statements made in pleadings opposing a summary judgment motion. The claim alleged that the statements violated a prior confidentiality and nondisparagement agreement. (*Id.* at p. 1488.) The court held that the policies underlying the litigation privilege would not be furthered by applying the privilege in that case. The court cited

26

*Navellier, supra,* 29 Cal.4th at page 94, in concluding that "[j]ust as one who validly contracts not to speak waives the protection of the anti-SLAPP statute [citation], so too has he waived the protection of the litigation privilege." (*Wentland*, at p. 1494.)

In *Crossroads Investors, L.P. v. Federal National Mortgage Assn.* (2017) 13 Cal.App.5th 757 the court held that the litigation privilege did not bar a claim for breach of an oral agreement concerning how the defendant would conduct a nonjudicial foreclosure. Citing *Navellier II,* the court concluded that, "[i]f one expressly contracts not to engage in certain speech or petition activity and then does so, applying the privilege would frustrate the very purpose of the contract if there was a privilege to breach it." (*Id.* at p. 787, citing *Navellier II, supra,* 106 Cal.App.4th at p. 774.)

Most recently, in *Monster Energy, supra,* 7 Cal.5th 781, our Supreme Court reaffirmed the waiver principle that it had explained in *Navellier.* The court held that the plaintiffs in *Monster Energy* had successfully shown that they would probably succeed in proving their claim against an attorney for breach of a confidentiality provision in a prior settlement agreement. (*Id.* at pp. 795–796.) In concluding that the plaintiff had met its burden under the second step of the anti-SLAPP analysis, the court quoted its prior statement in *Navellier* that " 'a defendant who in fact has validly contracted not to speak or petition has in effect "waived" the right to the anti-SLAPP statute's protection in the

27

event he or she later breaches that contract.' " (*Id.* at p. 796, quoting *Navellier, supra,* 29 Cal.4th at p. 94.)[7]

The cases that the Kesslers cite do not support applying the litigation privilege to Rubin's breach of contract claim. *McNair v. City and County of San Francisco* (2016) 5 Cal.App.5th 1154 and *Vivian v. Labrucherie* (2013) 214 Cal.App.4th 267 involved agreements that did not "clearly prohibit" the speech at issue and that implicated significant policies protecting communications to government agencies about matters of public concern. (See *McNair*, at pp. 1170–1171; *Vivian*, at p. 276.) The court in *Feldman v. 1100 Park Lane Associates* (2008) 160 Cal.App.4th 1467, 1497, distinguished *Wentland, supra,* 126 Cal.App.4th at page 1494, on the ground that, "unlike *Wentland* and several of the cases relied on by it," in *Feldman* "there was no breach of a confidentiality agreement or other agreement not to sue or refrain from comment." (*Feldman*, at p. 1497.) *Laborde v. Aronson* (2001) 92 Cal.App.4th 459 similarly did not involve any agreement not to engage in particular speech or petitioning activity.

Thus, the litigation privilege clearly does not apply to Rubin's claim for breach of the Settlement Agreement. He

---

[7] The litigation privilege was not at issue in *Monster Energy* because the defendant in that case did not make his challenged disclosures in the context of litigation. However, our Supreme Court's confirmation of the waiver principle is still compelling here. It would defy logic to conclude that a defendant waives anti-SLAPP protection by entering into a contract not to engage in particular speech but nevertheless retains the right under the anti-SLAPP statute to obtain dismissal of a claim for breach because the breach was privileged.

28

therefore met his burden to show that his claim was likely to succeed.

**4. The Trial Court Did Not Abuse Its Discretion in Awarding Attorney Fees to Rubin**

Section 425.16, subdivision (c) provides that, "[i]f the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion, pursuant to Section 128.5." As discussed, the trial court found that the Kesslers' motion was both frivolous and was "solely designed to cause unnecessary delay and expense."

We independently review issues of law that affect the trial court's ruling. (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1213; *Rudisill v. California Coastal Com.* (2019) 35 Cal.App.5th 1062, 1070 (*Rudisill*).) We otherwise review the trial court's decision to award fees for abuse of discretion. (*Rudisill,* at p. 1070; *Gerbosi v. Gaims, Weil, West & Epstein, LLP* (2011) 193 Cal.App.4th 435, 450 (*Gerbosi*).)[8]

The trial court properly concluded that the Kesslers' motion was frivolous. An anti-SLAPP motion is frivolous if it is "totally and completely without merit." (§ 128.5, subd. (b)(2).) This means that " 'any reasonable attorney would agree the motion

---

[8] The only issue of law bearing upon the trial court's ruling here is whether a reasonable attorney would have concluded that the litigation privilege applies to Rubin's claim for breach of the Settlement Agreement. As discussed above, we conclude as a matter of law that the privilege does not apply. And, as discussed below, we also hold that no reasonable attorney would conclude otherwise.

was totally devoid of merit.' " (*Rudisill, supra,* 35 Cal.App.5th at p. 1070, quoting *Gerbosi, supra,* 193 Cal.App.4th at p. 450.)

The trial court explained that, upon reviewing the language in the FAC that the Kesslers sought to strike, "the only conclusion the Court can draw is that, at bottom, this motion is based on the claim that when a settlement agreement is entered into in litigation, an action to enforce a settlement agreement is barred by the Anti-SLAPP statute. *Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788, of which defendants' counsel was aware when he filed this motion, could not more clearly establish that this position is without merit, whether under the first with [*sic*] the second prong of the Anti-SLAPP statute."

Although the trial court did not address the litigation privilege, its reasoning was sound. As discussed above, the Kesslers' pleadings clearly asserted claims that they promised in the Settlement Agreement they would not assert. And *Monster Energy*, along with the other cases discussed above, establish that a party waives protection from a breach of contract claim under the litigation privilege as well as under the anti-SLAPP statute by agreeing not to assert particular claims in future litigation.

We differ from the trial court in concluding that the Kesslers' anti-SLAPP motion failed at the second rather than the first step of the anti-SLAPP analysis. But, in concluding that our Supreme Court's decision in *Monster Energy* applies to both "the first [and] the second prong of the Anti-SLAPP statute," the trial court recognized that the waiver analysis in the opinion precluded a breach of contract claim under the second prong. And we may affirm the trial court's ruling on any legal ground

30

that supports it.  (See *Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 980–981.)

No reasonable attorney could analyze the cases discussed above and conclude that a defendant who has clearly breached a contract not to assert particular claims may strike a cause of action for breach under the anti-SLAPP statute on the ground that the defendant's conduct was privileged.  The trial court therefore reasonably concluded that the Kesslers' motion was frivolous.

The trial court also acted within its discretion in finding that the Kesslers filed their motion for the sole purpose of delay. The court could reasonably infer a motive to delay from the absence of merit in the Kesslers' motion.  (See *Olive Properties, L.P. v. Coolwaters Enterprises, Inc.* (2015) 241 Cal.App.4th 1169, 1177.)  And the Kesslers' prior litigation tactics support the conclusion that the Kesslers engaged in a pattern of using litigation as a means to obstruct and harass Rubin in a bitter neighbor dispute, which Judge Chalfant aptly described as a "tempest in a teapot."  The trial court could reasonably conclude that the Kesslers' anti-SLAPP motion was the latest example of a litigation strategy to impose delay and expense.

## DISPOSITION

The trial court's order is affirmed.  Rubin is entitled to his costs on appeal.

NOT TO BE PUBLISHED.


LUI, P. J.

We concur:



CHAVEZ, J.



HOFFSTADT, J.