Filed 10/16/24  Warner v. Thompson CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| BERNA LYNN WARNER,<br><br>        Cross-Complainant and Appellant,<br><br>        v.<br><br>EVAN THOMPSON et al.,<br><br>        Cross-Defendants and Appellants. | B324902<br><br>Los Angeles County<br>Super. Ct. No. 20STCV33912 |

APPEAL from an order of the Superior Court of Los Angeles County, Mel Red Recana, Judge.  Affirmed in part, reversed in part, and remanded.

Fredman Legal, Cameron Fredman for Appellant and Cross-Respondent.

Lewis Brisbois Bisgaard & Smith, Jeffry A. Miller and Ernest Slome; Gipson Hoffman & Pancione, Kenneth I. Sidle for Respondents and Cross-Appellants.

Berna Warner's appeal and Evan Thompson's cross-appeal arise from a dispute that took place at the height of the coronavirus pandemic in the summer of 2020.

Thompson is the guardian ad litem for his sister Lynn, who is elderly and disabled. When Thompson's sister and her caregivers contracted COVID-19, he directed the caregivers to relocate to his sister's condominium building to quarantine together. They did not tell anyone at the condominium that they had COVID-19.

Warner is the president of her homeowner's association at the condominium where Thompson's sister went to quarantine. She was responsible for safeguarding the health and welfare of her condominium, where the majority of residents were elderly people with health conditions like her. Warner oversaw the condominium's implementation of comprehensive safety protocols to prevent COVID-19 on its premises before vaccines were available and before there was clarity on how the virus spread.

Warner and the rest of the condominium's board members soon found out about the caregivers entering the building and using the common areas without disclosing their COVID-19 diagnosis. They voted to ban the caregivers from the premises of the condominium indefinitely. This also effectively banned Thompson's sister, who was inseparable from her caregivers.

Thompson's sister filed a discrimination complaint against the condominium, and obtained a preliminary injunction enjoining it from blocking access to her caregivers while she resided there.

Warner then filed a cross-complaint against Thompson and his sister's caregivers, asserting tort claims stemming mostly from the caregivers' decision to enter the condominium while

infected with COVID-19 and to use the common areas. Other claims were based on Thompson's pre-litigation activities.

Thompson responded with an anti-SLAPP motion (see Code Civ. Proc. § 425.16) to strike the cross-complaint in its entirety.

The trial court partially granted and partially denied Thompson's motion. The court properly denied the motion as to the nuisance and negligence causes of actions. These claims arose from the caregivers' actions that potentially exposed the condominium's residents to the coronavirus. The court appropriately handled Warner's "mixed" emotional distress and elder abuse causes of actions. We affirm the trial court's order as to these five causes of action.

The trial court erred in granting Thompson's motion as to Warner's concealment cause of action, which is also a "mixed" cause of action. We reverse the trial court's order with respect to the concealment cause of action.

I

For purposes of assessing Thompson's anti-SLAPP motion, we assume the truth of Warner's allegations. (See *Young v. Tri-City Healthcare Dist.* (2012) 210 Cal.App.4th 35, 54.) We recount these allegations, along with other undisputed facts before the trial court.

A

The Diplomat is a 64-unit condominium building in West Los Angeles. The supermajority of the Diplomat's residents are over the age of 65. Eleven residents are over 90, and twenty-two of the residents are over 80. Many of the Diplomat's residents have serious health conditions that increase their vulnerability to COVID-19.

3

Warner is an elderly person with health concerns who resides at the Diplomat. At the relevant times, Warner was president of the Diplomat's Board of Directors, which consists of five unpaid volunteers who, according to the Diplomat's governing documents, make decisions for the general health, welfare, comfort, and safety of the residents and staff.

In March 2020, the World Health Organization declared COVID-19 a pandemic, the president of the United States declared it a national emergency, and the governor of California issued a statewide "stay-at-home" order.

Within days, the Diplomat's Board of Directors met to discuss the implementation of California's "stay-at-home" mandate. Given the high percentage of elderly residents especially vulnerable to COVID-19, the Board hired Dr. Eric Snyder, the Chief Risk Officer at Pacific HealthWorks, LLC, to advise it on safety measures. The Board enacted "Precautionary Protocols" in an effort to carry out its duty to "provide for the general health, welfare, comfort and safety of the residents." The Board notified the Diplomat's residents of the Protocols by placing hard copies under the doors of each unit, by posting them in the Diplomat's common areas, and emailing them to residents.

The Protocols included the following: requesting residents and staff to report a positive diagnosis of COVID-19 to the Diplomat's manager; restricting the use of the two elevators to one family unit at a time; disinfecting elevator buttons, doorknobs to trash chutes, and doors every half hour; reducing on-site staff; suspending valet services; installing disinfectant dispensers; and requiring temperature checks of non-residents entering the lobby. The Diplomat remained free of COVID-19 until July 30, 2020.

4

At some point in late July, Lynn Thompson, an elderly disabled woman who owns a unit at the Diplomat, contracted COVID-19. Lynn Thompson is not a party to this appeal, but is the sister of respondent and cross-appellant Evan Thompson. When we refer to "Thompson" in this decision, we mean Evan Thompson. Nevertheless, Lynn Thompson figures in this case as well.

Lynn Thompson suffers from dementia and dystonia. She is dependent on her full-time live-in caregivers Chandar Pandey and Kimberly Leong, a married couple who had been caring for her for nearly a decade. Pandey and Leong are also respondents and cross-appellants. In the months before July 2020, Lynn Thompson resided at Pandey's and Leong's home in Studio City.

Lynn Thompson, Pandey, and Leong all tested positive for COVID-19 in late July 2020. After consulting doctors, Evan Thompson directed Pandey and Leong to quarantine with his sister at the Diplomat. According to Evan Thompson, the reason for relocating to the Diplomat rather than returning to Studio City was so Lynn Thompson could be closer to her doctors at UCLA. Evan Thompson believed UCLA would provide the best care for his sister and did not want her to receive care at another facility. He, Pandey, and Leong believed that, if they stayed in Studio City and Lynn Thompson required an ambulance again, the paramedics would refuse to take her to UCLA because of the distance.

On July 30, 2020, Pandey, Leong, and Lynn Thompson arrived at the Diplomat. Ambulance paramedics took Lynn Thompson to her unit, while Pandey and Leong used the garage entrance to avoid the Diplomat personnel administering temperature checks in the lobby.

5

Over the next three days, Pandey and Leong left Lynn Thompson's unit several times and used the condominium's common areas and elevators. The Diplomat's personnel reviewed security camera footage and observed Pandey using the common areas and elevators fourteen times and saw Leong at least once outside of Lynn Thompson's unit. Pandey and Leong did not wear gloves or wipe the elevator buttons after using them, nor did they disclose their COVID-19 status to anyone at the condominium. They also did not disclose the severity of their symptoms: Leong suffered from fever, fatigue, chills, a cough, headache, shortness of breath, and aches, and Pandey had a cough and fatigue.

Lynn Thompson fell ill a few days into the quarantine. An ambulance came to the Diplomat to take her to the hospital. Pandey and Leong told the paramedics that they, along with Lynn Thompson, were all positive for COVID-19. One of the paramedics, without Pandey's or Leong's consent, told an employee of the Diplomat to disinfect the elevator because Lynn Thompson, Pandey, and Leong had COVID-19. Shortly afterwards, the Diplomat's manager asked Pandey and Leong to leave immediately, which they did.

Word spread quickly among the Diplomat's residents and staff that three people infected with COVID-19 had been in the building. Panic ensued. Warner received calls from angry and distraught residents who worried that Pandey and Leong had exposed them to COVID-19.

Warner and the other members of the HOA Board voted to deny Pandey and Leong access to the Diplomat because the two had deliberately exposed residents and staff to COVID-19. As

6

president, it was Warner's responsibility to communicate the Board's resolution to Evan and Lynn Thompson.

Warner called Evan Thompson. Once she told him that Lynn Thompson had been taken to the hospital, Thompson responded that he already knew and did not wish to discuss it with her. Thompson ended the call before Warner could tell him about the Board's resolution.

The next day, Warner drafted a letter summarizing the Board's investigation with respect to the Caregivers and the Board's decision to deny them access to the Diplomat. The letter explained that the Board was "extremely upset" by the conduct of Pandey and Leong for having "acted with reckless disregard for the health and safety of the Owners and staff of the Diplomat – many of whom are senior citizens with pre-existing conditions." The letter continued: "Please be advised that Kim Leong and her husband, and any related family members will not be permitted to enter the Diplomat under any circumstances for any purpose." The letter concluded: "Naturally, we wish your sister all the best and a full and complete recovery. As her nearest relative and her emergency contact for the Diplomat, please take appropriate steps on her behalf."

Warner attempted to send the letter to Thompson by messenger, FedEx, and text message. Thompson never responded.

Warner messengered a similar letter to Lynn Thompson at her UCLA hospital room.

In mid-August, Leong called Warner to demand access to the Diplomat. Leong's tone was hostile and she "berated" Warner. Leong also told Warner that Evan Thompson had directed her and her husband's actions.

7

On August 21, 2020, Evan Thompson's lawyers called Warner to inform her that Lynn Thompson, Pandey, and Leong intended to return to the Diplomat imminently. They followed up with a letter on the same day, asserting that Pandey and Leong had not been reckless, as they had taken appropriate precautions by wearing masks, by avoiding contact with others, and by washing their hands. The letter charged that the Diplomat's refusal to allow Pandey and Leong entry infringed upon Lynn Thompson's right to reasonable accommodations under the Fair Employment and Housing Act (FEHA) as a disabled person, as hiring new caregivers was not an option for her. The letter concluded by requesting the negotiation of a "mutually satisfactory resolution," but warned that Evan Thompson had authorized counsel to file a lawsuit.

The Diplomat, through counsel, proposed the following compromise: the Diplomat would permit Pandey and Leong to return to Lynn Thompson's unit with her if all three provided negative COVID-19 tests within 48 hours of entering the Diplomat, and if they agreed to remain with Lynn Thompson in her unit for 14 days.

Lynn Thompson, through her lawyers, rejected this offer. She, Pandey, and Leong were unwilling to provide a negative COVID-19 test or to quarantine for 14 days, but they provided "Work Status Report" forms for Pandey and Leong signed by a Kaiser Permanente nurse practitioner affirming that they "may return to work without restrictions" and are "no longer contagious."

Thompson's lawyers also provided a letter from Dr. Neil Wenger, an internal medicine specialist practicing at UCLA. Wenger's letter stated that "Ms. Thompson has had a difficult

time in the hospital in part related to her being in a foreign environment." Wenger wrote that it was "critical" for Lynn Thompson to "return to her home with the help of her current caregivers." Warner later learned, however, that Thompson's attorneys had drafted the letter and that Wenger had never treated Lynn Thompson, Pandey, or Leong.

About a week later, Lynn Thompson filed a complaint against the Diplomat and Warner alleging discrimination under FEHA and applied ex parte for a preliminary injunction to enjoin the Diplomat and Warner from barring Pandey and Leong from entering the premises. The Diplomat and Warner opposed the application.

The court found Lynn Thompson had shown a reasonable prospect of success on her FEHA disability claim and enjoined the Diplomat from denying the Pandey and Leong entry while Lynn Thompson resided in her unit. Eventually, the parties settled Lynn Thompson's lawsuit.

B

Nearly a year after the court granted this preliminary injunction, Warner cross-complained against Evan Thompson, Pandey, and Leong.

Most of the cross-complaint's allegations arise from Evan Thompson's decision to relocate Pandey, Leong, and Lynn Thompson to the Diplomat while they were infected with COVID-19, without informing anyone at the Diplomat of their diagnoses, and in disregard of the Diplomat's Protocols. Some allegations derive from communications Lynn and Evan Thompson's lawyers sent in response to the Diplomat's decision to ban Pandey and Leong from the building premises and the ensuing dispute between the parties.

9

Warner asserted six causes of action: (1) Public Nuisance; (2) Private Nuisance; (3) Concealment; (4) Negligence; (5) Intentional Infliction of Emotional Distress; and (6) Elder Abuse.

In response, Evan Thompson, Pandey, and Leong filed a special motion to strike Warner's cross-complaint under Code of Civil Procedure § 425.16.

The trial court rendered a split decision. It granted part of Thompson's motion but it also denied a portion of the motion.

Regarding Warner's first, second, and fourth causes of action for public nuisance, private nuisance, and negligence, the court found these did not arise from protected activity under § 425.16(e). These causes of action, the court explained, arose from alleged violations of the Diplomat's COVID-19 safety protocols by Evan Thompson, Pandey, and Leong, "thereby creating a hazardous or dangerous condition at the residential community." The court found these facts "do not establish conduct in furtherance of the exercise of the constitutional right of petition or free speech in connection with a public issue."

As for Warner's fifth and sixth causes of action for intentional infliction of emotional distress and elder abuse, the court found these to be "mixed causes of action" because "they include both protected and unprotected activity." Insofar as the emotional distress and elder abuse causes of actions relied on the allegations that Evan Thompson, Pandey, and Leong created dangerous conditions at the Diplomat from July 30 to August 1, the court found they were not protected activities under the anti-SLAPP statute.

However, to the extent these two causes of action relied upon letters, emails or other communications from Evan Thompson's lawyers that caused Warner emotional distress from

10

mid-August onwards, the court found these allegations did pertain to protected activity.

The court granted the special motion to strike the allegations in the fifth and sixth causes of action relating to Evan Thompson's communications and dispute with the Diplomat and Warner, but denied it as to the remaining allegations, leaving the fifth and sixth causes of action partially intact.

The court granted the motion to strike as to the third cause of action for concealment, reasoning that the allegations supporting the third cause of action relied on Thompson's lawyers' communications to Warner and the Diplomat in the midst of the controversy about COVID-19 safety protocols "affecting the residential community at large." The court also found Warner was unlikely to succeed on the merits of her concealment claim.

Finally, the court denied Warner's request for attorney's fees and deferred ruling on Thompson's request for fees.

Warner appeals the court's order with respect to the concealment claim and the striking of certain paragraphs in her fifth and sixth claims. She also argues the trial court erred in denying her request for attorney fees.

Thompson cross-appeals the remainder of the trial court's order.

## II

Our review of orders deciding anti-SLAPP motions is independent. (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067.)

The anti-SLAPP analysis has two steps. (*Monster Energy Co. v. Schecter* (2019) 7 Cal.5th 781, 788.) At step one, we determine whether Thompson has established that any of the

11

causes of action in Warner's cross-complaint arise from activity that section 425.16 protects.  (*Ibid*.)  If a cause of action is "mixed," meaning it arises from allegations of both protected and unprotected activities, we separate the non-SLAPP allegations from the allegations arising from protected activity.  (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 396.)  For any causes of action based on protected activity, we move to step two, where we evaluate whether Warner can demonstrate the merit of these causes of action by establishing a probability of success.  (*Ibid*.)  At step two, we look beyond Warner's cross-complaint and examine whether she can support her causes of action with a prima facie showing of facts that would allow a judgment in her favor.  (See *Newport Harbor Offices & Marina, LLC v. Morris Cerullo World Evangelism* (2018) 23 Cal.App.5th 28, 49.)

A

The trial court correctly denied Thompson's motion at step one of the anti-SLAPP analysis with respect to Warner's causes of action for public nuisance, private nuisance, and negligence. These claims do not arise from protected activity.

On appeal, Thompson contends the trial court erred by not finding these three causes of action within the scope of the anti-SLAPP statute's broad "catchall" provision in section 425.16(e)(4), which protects "[a]ny other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  Thompson claims the trial court improperly limited its inquiry to whether these actions fell within the protections of the first three categories of protected activities in section 425.16(e).

*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133 (*FilmOn*) instructs us to look at the content of the speech to see

12

what "public issue" or "issue of public interest" the speech implicates. (*Id.* at pp. 149-50.) Next, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest. (*Ibid.*)

Here, the conduct Warner challenged in the negligence and nuisance causes of action is Pandey's and Leong's entry into the Diplomat while sick with COVID-19, and their use of the Diplomat's common areas without gloves and without disinfecting what they touched on July 30, 31, and August 1. Thompson characterizes Pandey's and Leong's actions as "resist[ing]" the Diplomat's Protocols, which "concern a topic of widespread public interest: the proper extent to which the [COVID-19] pandemic protocols could be employed legally."

Demonstrating the implication of a public issue at step one is a low bar. (See *FilmOn, supra*, 7 Cal.5th at p. 150 ["virtually always, [anti-SLAPP movants] succeed in drawing a line – however tenuous – connecting their speech to an abstract issue of public interest."]) We assume, without deciding, that Pandey's and Leong's conduct implicates an issue of public interest.

We apply *FilmOn's* second step: we examine the relationship between this conduct and the public discourse on COVID-19 safety protocols.

Thompson's argument fails at this second stage. He argues the "resistance" of Pandey and Leong to the Diplomat's Protocols "contributed to the discourse of an issue of public interest regarding safety protocols for Covid-19 victims in residential communities such as the Diplomat." But nothing connected the caregivers' actions to discourse about COVID-19 safety protocols. Pandey and Leong entered the building without announcing their arrival. Their appearances and actions were unremarkable all

13

around—until residents chanced to learn the caregivers had the COVID-19 virus. In their sworn declarations, Pandey and Leong said they were unaware of any rule at the Diplomat requiring guests to disclose their COVID-19 status. They could not intend to resist something they did not know existed. There was no relationship between Pandey's and Leong's conduct and a public issue.

We affirm the trial court's decision on these causes of action.

B

Thompson concedes, and Warner does not dispute, that the trial court correctly decided that the emotional distress and elder abuse causes of action are "mixed." These causes of action include allegations of both protected and unprotected activity. To the extent that the emotional distress and elder abuse causes of action rely upon the same non-SLAPP allegations as the nuisance and negligence claims, the trial court was correct to deny Thompson's motion. (*Baral, supra*, 1 Cal.5th at p. 396 ["When relief is sought based on allegations of both protected and unprotected activity, the unprotected activity is disregarded at this stage"].)

The parties dispute, however, the extent to which these causes of action rely upon protected activity, and whether it was proper for the trial court to put these protected activity allegations through the second step of the anti-SLAPP analysis.

Warner contends the trial court erred in not finding the allegations were merely "incidental" to her emotional distress and elder abuse claims. Thompson disagrees, pointing out that the allegations of protected activity served as the grounds for at

14

least part of her emotional distress and elder abuse causes of action.

Thompson is right on this issue. To see why, we examine the allegations the trial court identified as arising from protected activity. Each allegation refers to Thompson's pre-litigation activities through his attorneys. Pre-litigation activities, including settlement discussions, are squarely within the anti-SLAPP statute's protections, because they involve written or oral statements or writings "made in connection with an issue under consideration or review by a . . . judicial body, or any other official proceeding authorized by law." (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1020 (*Bonni.*))

We italicize the key parts of these allegations.

Paragraph 42: "EVAN THOMPSON's *agents* also wrote letters and made phone calls, asserting falsely, that Lynn Thompson had been 'banned' from the Diplomat. On August 21, 2020, *attorneys for EVAN THOMPSON announced* to Warner that Lynn Thompson would be returning to the Diplomat with employees LEONG and PANDEY imminently. *They refused to provide information* regarding their COVID status or contagion *and repeated the misrepresentation* that Lynn Thompson had been 'banned.'" (Italics added.)Paragraphs 45-46: "The following day, on or about August 22, 2020, *counsel for EVAN THOMPSON provided a letter* from Doctor Neil Wenger, which stated: [¶] I am an internal Medicine specialist practicing at UCLA who has closely been following the course of Ms. Lynn Thompson during her hospitalization. Ms. Thompson suffers from dementia, among other medical conditions. . . The letter was silent with respect to Lynn Thompson, LEONG, or PANDEY's COVID-19 status and whether they were contagious. It would later be

15

discovered that Dr. Wenger had never treated or even met Lynn Thompson; she was not his patient; and he had never met LEONG or PANDEY. *The letter had been drafted by EVAN THOMPSON's attorneys*–although all of this was unknown at the time to [Warner] or the Diplomat." (Italics added.)

Lines 7-12 of Paragraph 50: "[Thompson's, Pandey's and Leong's intent to frighten Warner] was evident from their earlier communications: on August 21, 2020, [Thompson's] *agents* wrote, 'We want to underscore that we understand these are scary and uncertain times...' The following day, [Thompson's] *agent* wrote that [Warner] was acting 'based on fear . . .' On August 24, [Thompson's] *agent* again described [Warner] as 'operat[ing] from a place of fear . . .'" (Italics added.)

These allegations each refer to Thompson's pre-litigation activities through his lawyers, which commenced soon after Thompson learned the Diplomat had barred Pandey and Leong from the premises. The record shows that, when Thompson learned of this ban, he retained counsel to vindicate his sister's right to accommodations under FEHA. He authorized counsel to file a lawsuit if necessary.

We proceed to consider the "gravamen" of Warner's causes of action to determine whether certain allegations are elements, as opposed to background information. (*Bonni*, 11 Cal.5th at p. 1012.) Our review of Warner's cross-complaint establishes that her emotional distress and elder abuse claims *do* rely upon the allegations pertaining to Thompson's counsel's communications *as elements*, not background. As a result, Thompson's motion satisfied the first step of the anti-SLAPP analysis with respect to these two causes of action. (See *id.*)

16

The emotional distress cause of action contains general allegations that Thompson's actions were "outrageous," that he "intended to cause [Warner] emotional distress" and that Thompson is "guilty of oppression, fraud or malice." Similarly, the elder abuse cause of action contains general allegations that Thompson "engaged in forms of intimidating behavior, threats, harassment," "engaged in deceptive acts," and "engaged in false or misleading statements made with malicious intent to agitate, confuse, frighten, or cause severe depression or serious emotional distress of the elder."

Warner's argument that the allegations about the actions and communications from Thompson's lawyers are merely "incidental" to her cross-complaint fails. Rather, the "gravamen" of these causes of action, as Warner pleaded them, shows they include the allegations of protected activity as elements: Warner alleged that Thompson's lawyers caused her emotional distress and caused her harm amounting to elder abuse. It was thus proper for the trial court to analyze them under the second step of the anti-SLAPP analysis. (*Bonni*, 11 Cal.5th at 1012.)

At this second step, the trial court determined that Warner had failed to provide evidence establishing a prima facie finding for her emotional distress and elder abuse claims with respect to the protected activity allegations. Warner does not contest this finding on appeal, nor did she raise it at the hearing on the anti-SLAPP motion, after having the opportunity to review the court's tentative decision. She has therefore forfeited any argument that the trial court erred in striking paragraphs 42, 45-46, and lines 7-12 of paragraph 50. (See *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.)

17

C

The trial court erred in granting Thompson's motion as to Warner's concealment cause of action. Like the emotional distress and elder abuse causes of action, this one is also "mixed," and the court should have approached it the same manner.

The trial court found the concealment claim arose from protected activity "since it relates to [Thompson's] communications to [Warner] and the Diplomat in the context of an ongoing controversy, dispute, or discussion at that time regarding [COVID-19] and related safety protocols affecting the residential community at large."

A review of Warner's cross-complaint, however, reveals that her concealment cause of action does not rely only on allegations about Thompson's communications, but rather is mostly about the conduct of Thompson, Pandey, and Leong before anyone at the Diplomat learned Lynn Thompson, Pandey, and Leong had COVID-19. In support of her concealment cause of action, Warner alleges as follows: "'[Thompson, Pandey, and Leong] prevented [Warner] from discovering that [Pandey and Leong] and [Lynn Thompson] had been exposed to and were infected with [COVID-19] when they arrived at the Diplomat on July 30, 2020 and for the following three days . . . which was known only to them and that [Warner] could not have discovered." There are a few allegations alluding to Dr. Wenger's letter and some of the communications from Thompson's attorneys, but those allegations are only a small portion of those that compose the concealment cause of action.

The trial court erred in this ruling. Warner correctly notes the "period of concealment (while exposing [Warner] to infection) occurred between July 30 and August 1, 2020; whereas the first

18

purported protected communication occurred weeks later–on August 21, 2020." The trial court's analysis of the concealment claim discussed only communications between the parties, which took place weeks after the concealment.

And as Warner points out, Thompson, Pandey, and Leong did not conceal Lynn Thompson's, Pandey's, and Leong's COVID-19 status in contemplation or anticipation of future litigation. The fact that there were later settlement discussions and litigation did not transform the conduct from July 30 to August 1 into protected activity. (See *Clarity Co. Consulting, LLC v. Gabriel* (2022) 77 Cal.App.5th 454, 464 [denying anti-SLAPP motion at step one because at the time of the injury-producing activity, "there was no claim or dispute to be litigated or settled."]

In urging us to affirm the trial court on the concealment claim, Thompson relies on the same arguments we rejected with respect to Warner's nuisance and negligence claims. Those arguments likewise fail here.

The trial court ably separated the protected activity from the unprotected activity with respect to Warner's emotional distress and elder abuse claims.

Rather than remanding the concealment claim for further trial court review, we direct the trial court to strike subparagraphs (e), (f), and (g) from paragraph 73 of Warner's cross-complaint. In advance of oral argument, we posed the question to the parties about whether they would prefer a remand on this issue, or whether we should decide this issue ourselves. The parties united in asking, in the interest of litigation efficiency, that we *not* remand. We do their bidding.

19

In opposing Thompson's anti-SLAPP motion, Warner sought attorney's fees, pursuant to the statute's directive that the court award costs and reasonable attorney's fees in the event of a finding that "a special motion to strike is frivolous or is solely intended to cause unnecessary delay." (Code Civ. Proc. § 425.16, subd. (c)(1).)

The trial court denied Warner's request for attorney's fees and costs for opposing Thompson's motion because Thompson had prevailed on a portion of his motion.

We deferentially review the trial court's decision on attorney's fees and will not disturb this decision unless we are convinced that it is clearly wrong. (See *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1130.)

The trial court acted within its discretion in denying Warner attorney's fees under the anti-SLAPP statute. Fees are mandatory only if the court finds an anti-SLAPP motion frivolous. Thompson's motion was not frivolous. Warner's cross-complaint had some allegations of protected conduct, and Thompson succeeded in weeding these allegations out. We affirm the court's decision on Warner's attorney's fees.

## DISPOSITION

We reverse the order granting the motion as to the third count. We direct the trial court to strike subparagraphs (e), (f), and (g) from paragraph 73 of Warner's cross-complaint.

///

///

///

We affirm the remainder of the order and remand for proceedings consistent with this opinion.  We award costs to Warner.


                                        WILEY, J.

We concur:


        GRIMES, Acting P. J.


        VIRAMONTES, J.